DAVID MORRIS,

Plaintiff,

*vs.*

STANDARD GAS AND ELECTRIC COMPANY,

Defendant,

PRIOR PREFERENCE STOCKHOLDERS' PROTECTIVE COMMITTEE,

Intervener Defendant.

*New Castle, January 20, 1949.*

*H. Albert Young,* and *Samuel Morris,* of New York City, for plaintiff.

*Robert H. Richards,* of the firm of Richards, Layton and Finger, and *Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, and *A. Louis Flynn* of Chicago, Ill., for defendant.

*Hugh M. Morris* and *Alexander L. Nichols,* of the firm of Morris, Steel, Nichols & Arsht. *Milton H. Cohen,* of

Chicago, Ill., of counsel, for intervener defendant Prior Preference Stockholders' Protective Committee.

SEITZ, Vice-Chancellor: Plaintiff seeks a preliminary injunction to prevent the defendant corporation from paying dividends declared on certain classes of its preferred stock on the ground that such action would violate the *General Corporation Law of Delaware*.

*Section 34* of the *General Corporation Law of Delaware* sets forth the circumstances under which the directors of a Delaware corporation shall have the power to declare and pay dividends. Insofar as pertinent, *Section 34* provides:

"The directors * * * shall have power to declare and pay dividends * * * either (a) out of its net assets in excess of its capital as computed in accordance with the provisions of Sections * * * or (b), in case there shall be no such excess, out of its net profits for the fiscal year then current and/or the preceding fiscal year; provided, however, that if the capital of the corporation computed as aforesaid shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired."

Under the power purportedly given by *Section 34 (b)*, the directors of the defendant corporation on December 20, 1948 declared a regular quarterly dividend on the $7 and the $6 prior preference cumulative stock to be paid on January 25, 1949. Shortly thereafter, plaintiff filed this action to enjoin the payment of the dividends on the ground that the requirements of *Section 34 (b)* had not been met because the net value of the assets was less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon

the distribution of assets. This is the decision on the application for a preliminary injunction which was heard entirely on affidavits.

The defendant is a Delaware corporation and a public utility holding company. It has outstanding 368,348 shares of prior preference stock $7 cumulative, and 100,000 shares of prior preference stock $6 cumulative. Each of the series mentioned is entitled to cumulative dividends payable quarterly at the annual rate indicated before any dividend may be paid on any other class of stock. In the event of liquidation or dissolution, each share of both series is entitled to a $100 preference over the shares of any other class, plus all dividend arrearages. No dividends have been paid on either series since 1934 and as of September 30, 1948 the $7 series had a per share arrearage of $102.90, and the $6 series an arrearage of $88.20, or an aggregate arrearage on both series of $46,723,009.20.

Defendant also has outstanding 757,442 shares of $4 cumulative preferred stock. This stock has a yearly cumulative dividend preference of $4 per share over the common stock. Subject to the rights of the prior preference stock, this class is entitled to receive $50 per share, plus arrearages in the event of liquidation or dissolution before any distribution is made on the common stock. No dividends have been declared on this stock since 1933, and as of September 30, 1948, the arrearages on the class aggregated $47,213,-884.67.

Defendant has outstanding 2,162,607 shares of common stock.

The defendant's board consists of 9 directors, 3 are elected by the holders of the $6 and $7 shares voting as a class, 2 by the $4 shareholders voting as a class, and 4 by the common stockholders voting as a class.

The facts surrounding the declaration of the dividend can best be presented in chronological order. The defend-

ant by an agreement dated December 21, 1945, as amended, had borrowed $51,000,000 from a group of banks. Under this agreement the defendant was prohibited from paying any dividends so long as any of the notes issued under the agreement remained unpaid. In order to clear the way for the declaration of a dividend, the defendant negotiated a new bank loan agreement dated November 26, 1948, under which about $11,600,000 was secured to liquidate the balance of the 1945 obligation. The new agreement permitted the defendant to declare current quarterly dividends on its prior preference stock, provided the amount of the dividends so paid does not exceed the dividend income received by the defendant after September 30, 1948.

Once the defendant was assured that the new bank loan agreement would be signed, its directors met to consider the possibility of declaring the regular quarterly dividend on the $6 and $7 prior preference stock. At a directors' meeting held on November 17, 1948, the minutes recite that all the directors discussed at length various considerations arising in connection with the question of the declaration of current quarterly dividends on the company's prior preference stock. The directors were advised that the Rules of the S. E. C. prohibit a registered holding company from paying dividends out of unearned surplus or capital without the permission of the Commission. The minutes recite:

"* * * that the Company had on its balance sheet an item designated 'Earned Surplus since December 31, 1937,' the amount of which at October 31, 1948, was $25,602,663.61; and that in view of the qualification by the independent accountants of the Company to the effect that the investments of the Company are subject to such adjustment as may be required in the completion of the corporate simplification program under the Public Utility Holding Company Act of 1935 [15 U. S. C. A. § 79 et seq.], it appeared desirable that the Company obtain from the Securities and Exchange Commission, before the declaration by the Board of current quarterly dividends on the Prior Preference Stock, authority to declare and pay those dividends, which would be charged to that item."

After a discussion by the directors, a resolution was

passed authorizing the officers of the defendant to file with the Commission such papers as in their judgment would be necessary or advisable in respect to the proposed declaration of a dividend on the prior preference stock.

About November 24, 1948, the defendant filed an application with the Commission requesting authority to pay current quarterly dividends on its prior preference stock. The application made it clear that the defendant corporation did not concede that the payment would be out of capital.

On December 7, 1948, the directors met, and reference was made to the possibility mentioned at the November 17, 1948 meeting that a dividend might be declared on the prior preference stock. The meeting was advised that an application had been made to the Commission for authority to pay such dividend. The chairman advised the meeting that consideration had been given to the Delaware statute and that in order that the company might have evidence of its compliance with the Delaware statute, W. C. Gilman and Company, at his request, prepared an appraisal of the assets to determine whether in its judgment the assets less the liabilities exceeded $88,500,000—this figure is the approximate total of the aggregate capital represented by the $7, $6, and $4 preferred, plus the sum required to pay a quarterly dividend on the prior preference stock ($87,350,-943.35 plus $794,609). It is not denied that W. C. Gilman and Company possesses expert competence in appraisal matters and is familiar with the defendant's assets by reason of having been engaged to study them for other purposes. The factual appraisal made by Gilman and Company and submitted to the meeting was necessarily somewhat general. This appraisal discussed the values of the various stocks owned by the defendant by reference to market value, past, present, and future earnings, percentage of stock owned and knowledge based on other studies and sources of information. The report concluded that the net assets of the defendant had a fair value substantially in excess of

$88,500,000. The meeting also heard a report made by G. W. Knourek, vice-president and treasurer of the defendant corporation. Mr. Knourek was eminently qualified both in education and experience to make such a valuation. His complete familiarity with the defendant's assets is clearly demonstrated. This report dated December 6, 1948 also discussed the value of the stocks and concluded that the fair value of the defendant's net assets substantially exceeded $88,500,000. In this report Mr. Knourek stated that in appraising the assets he gave consideration to market prices, capitalization of current dividends, capitalization of average earnings for the two years nine months ending September 30, 1948, appraisals made in 1943 in connection with the defendant's recapitalization, and the recent orders of the S. E. C. with respect to Louisville Gas and Electric Co. (Del.) and a sale of Oklahoma Gas and Electric Co. stock. The chairman made a statement to the meeting that he had examined the Gilman and Company report and the statement by Mr. Knourek, and that in his opinion a fair value of the net assets was in excess of $88,500,000. He explained to the meeting the methods he used in his study and valuation.

The chairman also stated that since this was the first time this matter had come before the board in many years, he had obtained opinions from two Delaware attorneys and one Chicago attorney as to whether a dividend might legally be declared under the Delaware statute. The opinion, which was read to the meeting, stated that based on the assumptions contained therein the company might legally pay the dividend under the Delaware law.

The minutes recite that the board made numerous inquiries and discussed the asset value problem generally. A balance sheet of the company as of October 31, 1948, and a statement of its income for the twelve months ending that date were presented to the meeting. The chairman suggested an adjournment of the meeting with the hope

that in the interim a Commission order would be entered permitting the proposed dividend declaration to become effective.

A public hearing was held by the Commission at which hearing the present plaintiff appeared and objected to the defendant's proposal. After considering the record, a memorandum by the present plaintiff opposed and a memorandum of the prior preference protective committee in support of the proposal the Commission by order dated December 17, 1948, permitted the proposed dividend to become effective forthwith, but provided, *inter alia,* that the stockholders be advised "that the Commission permitted the declaration to become effective without determining whether the payment is being made out of capital."

The Commission's opinion contains the following language:

"* * * David Morris & Co. has attacked the valuation and the witnesses who testified in support of it. Although we are not convinced that this issue raised by the objecting stockholder is relevant to these proceedings, nevertheless we have considered the record and are not persuaded that the objection is well founded in fact. However, it should be clearly understood that we are expressing no opinion as to whether this valuation should be accepted for any purpose other than that for which it was presented."

In the light of the Commission's conclusion that the dividend would be allowed without deciding whether the dividend payment would be out of capital, it is apparent that the quoted factual conclusion was in the nature of a "factual dictum" by an administrative body. In view of my approach to the problem presented, it is unnecessary to consider what weight should be given to the Commission's remark.

The directors met on December 20, 1948, and having been advised of the Commission's approval of the proposed dividend, and after discussion, unanimously adopted a resolution providing for a dividend of $1.75 per share on the

$7 and a dividend of $1.50 per share on the $6 cumulative preference stock to be paid January 25, 1949 out of the net profits of the defendant corporation accumulated since January 1, 1947, and to be charged to the earned surplus account.

On December 28, 1948, plaintiff filed this action seeking a temporary injunction against the payment of the dividend. As permanent relief, plaintiff requested that the defendant be enjoined from paying any dividend on its stock until the court determined that any such dividend would not constitute a payment out of capital or unearned surplus in violation of the Delaware law. Has plaintiff made out a case for interlocutory relief?

Plaintiff says that when the dividend was declared the capital of the defendant (its assets less its liabilities) was not equal to the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon distribution. The defendants, of course, take a contrary view. I am not persuaded that the contention and the denial pose the precise issue this court must decide because it assumes that one objective value exists and is capable of being determined.

The defendant corporation concedes that the power to pay the proposed dividend must be found under *Section 34(b)* of the *General Corporation Law of Delaware*. It is clear that the net profits of the defendant corporation for the then current and/or the preceding fiscal year are more than sufficient to cover the proposed dividend, and it is clear that the proposed dividend will be charged to the earned surplus account. The sole question then is whether the conditions of the proviso contained in *Section 34(b)* have been met. Otherwise stated, at the time the board of directors declared the dividend in question were they entitled to conclude that the net assets of the defendant were at least equal to the aggregate amount of the capital represented by the issued and outstanding stock of all

classes having a preference upon distribution? Stated with relation to the present facts, were the net assets worth at least $88,145,552.35—being the amount of capital represented by the outstanding stock having a preference on distribution, plus the proposed quarterly dividend.

The problem is one of valuation which is surpassed in difficulty only in the domestic relations law. The numerous and varied standards applied in the legal, accounting and business fields have mapped a wavering course for one required to resolve a substantial problem of valuation. Here the governing statute has declared that the capital must—roughly speaking—be valued at its dollar equivalent before a dividend can be declared out of net profits for a designated period. This duty falls to the directors. What legal standard will be applied in determining whether the directors have valued the corporate assets in a manner deemed sufficient to comply with the requirements of *Section* 34 (*b*) ?

The plaintiff's attorney stated at the oral argument that he did not charge that the directors were guilty of any fraud or bad faith in valuating the capital assets at a dollar value which would satisfy the provisions of *Section* 34 (*b*). He appeared to take the position that based on the standards he would apply in evaluating the assets, they were not sufficient to comply with the requirements of the statute, and hence the action of the directors violated the statute. He also took the position that nothing short of an actual appraisal of the assets in the underlying companies whose stock was owned by the defendant would be sufficient. Let us consider the second problem first.

Initially, of course, reasonable men can differ as to what constitutes an appraisal. If by an appraisal plaintiff means that all the assets had to be viewed and evaluated separately by the directors or experts in a manner similar to a valuation for purposes of a reorganization of the type currently popular at least in the utility field, then I conclude that the statute imposes no such requirement on the direc-

tors as a prerequisite to the employment of the power granted in *Section* 34(*b*). In large companies, especially those such as the defendant, an appraisal of the type suggested by plaintiff would mean that as a practical matter the provisions of *Section* 34(*b*) would be unavailable. See generally II *Bonbright, Valuation of Property, pp.* 973-974. I prefer the view expressed in the following language of the New York Supreme Court in *Randall v. Bailey, Sup.,* 23 *N.Y.S.* 2*d* 173, 184, affirmed 288 *N.Y.* 280, 43 *N.E.* 2*d* 43:

> "I see no cause for alarm over the fact that this view [taking assets at actual value] requires directors to make a determination of the value of the assets at each dividend declaration. On the contrary, I think that is exactly what the law always has contemplated that directors should do. That does not mean that the books themselves necessarily must be altered by write-ups or write-downs at each dividend period, or that formal appraisals must be obtained from professional appraisers or even made by the directors themselves. That is obviously impossible in the case of corporations of any considerable size."

In concluding that a formal appraisal of the type mentioned is not required, I do not mean to imply that the directors are not under a duty to evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present "values." It is not practical to attempt to lay down a rigid rule as to what constitutes proper evidence of value for the consideration of directors in declaring a dividend under *Section* 34(*b*). The factors considered and the emphasis given will depend upon the case presented. At the expense of brevity, let us consider what the directors of the defendant corporation actually did in connection with the declaration of the dividend under attack and then evaluate that action.

Since no dividend had been declared for a great many years, the directors proceeded with some caution. Having seen that the current net assets were more than sufficient to meet the dividend requirements of the $6 and $7 preferred stock, the directors considered the possibility of paying such dividends. The first obstacle to such payment was removed

by negotiating a new bank loan. Plaintiff points out that defendant corporation was apparently required to pledge or restrict practically its entire portfolio for this loan of $11,600,000, callable on three days' notice for default. Plaintiff argues that the very fact that the banks required the defendant to pledge or restrict assets which the defendant values at over $100,000,000 to secure a loan of $11,600,000 is evidence that the assets were not worth anything near the value placed on them by the board of directors for dividend purposes. Nothing appears in the papers before me which would throw any light on the question as to why assets of the value alleged were pledged or restricted. Lacking particulars, I do not feel that I should give any particular weight to this argument advanced by the plaintiff. Moreover, plaintiff concedes that the assets are worth upwards of $50,000,000, yet there is no explanation as to why the banks would require a pledge or restriction on assets even at the value placed on them by plaintiff, which is many times the value of the loan.

The directors considered the value factor at three meetings and had available and personally studied the reports concerning the defendant's assets prepared by admitted experts in the field. They had the balance sheets and profit and loss statements. Moreover, evidence as to value became available through the hearing before the S. E. C. even though the issue there presented was not the one now before this court.

That then is what was done before directors representing all classes of stock unanimously declared the dividend now under attack. Let us examine the case presented by plaintiff.

Plaintiff relied on his sworn complaint and his two affidavits. Since October 27, 1947, plaintiff has been the holder of record of 100 shares of the defendant's $4 cumulative preferred stock. In his complaint the plaintiff sets forth his "opinion" of the value of defendant's assets and

arrives at a gross value of $82,109,858. After deducting liabilities of $11,242,729, the plaintiff determines the defendant's net worth to be $70,863,829. The complaint merely sets forth plaintiff's opinion of the value of each asset owned by the defendant, plus the following allegation:

"Complainant in arriving at the total of $82,109,858, used the figures shown on the left side of Exhibit 'B'. While recently 100 shares of Philadelphia Co. stock sold for $9.75 per share, he feels that a large block could not be sold at such price. Wisconsin Public Service stock pays 20c dividend, or 5% on a value of $1.00 [sic]. Stocks just as sound, if not better, are yielding 7% and 8%. It has no market value. The stock showing 'no value' are considered valueless and have no market value. The other stocks are valued at market prices."

Plaintiff's first affidavit recites once again his opinion of the value of the defendant's assets with one remarkable change. In his affidavit he states that "Thru a clerical error, the value of Wisconsin Public Service was erroneously listed in Exhibit 'B' to the injunction bill at $1.00 per share, instead of $10.00 per share." This error is the more remarkable because it amounted to an error of $12,375,000, and meant that in drawing his complaint plaintiff by his own statement under-estimated the value of the defendant's assets by that amount. Plaintiff in his first affidavit also revised his net asset value in several respects, but principally to correct the clerical error. After these revisions, plaintiff arrived at a figure of $81,728,640 which he designated as "(Net Assets (Appraised)". He then proceeded to deduct the sum of $25,244,457 from this figure and arrived at the sum of $56,484,183 which he describes as "net assets with safety margin". This item is explained by a note which says:

"Less for safety margin 33 1/3% of $50247900 Phila stock and 20% of 42475785 other operating utility stock or total deduction of $25 244 457."

The plaintiff's affidavit supplies plaintiff's explanation of the "safety margin" deduction. It reads:

"At the moment we are, in my opinion, at a critical point in an

inflated economy. Conditions are highly uncertain. Earnings are now high. If our economy contracts, stocks can go lower. I do not think that it would be prudent for a company like the respondent with relatively little cash, to pay a cash dividend at this time without allowing a margin of safety for its investments. I think that a fair margin for safety would be 33-1/3% for a utility holding company like the Philadelphia Company herein mentioned and 20% for the other operating utility companies such as Oklahoma Gas & Electric Co. and the others mentioned in Exhibit 'D'."

Plaintiff appraises the net assets at about $82,000,000 before his "safety margin" deduction. There is no justification under *Section* 34 (*b*) for requiring an arbitrary deduction from present value before ascertaining the value of the net assets. The safety factor mentioned by plaintiff actually is an element in present value, but there is no justification under the statute for determining present value, and then making an arbitrary deduction. This "safety margin" deduction is actually an attack on the wisdom of the directors in declaring a dividend at the present time. Indeed, in attempting to justify his argument for a deduction plaintiff speaks of what is "prudent". Where, as here, the only question is one of compliance with the statute, and there is no suggestion that the directors have been guilty of fraud or bad faith in attempting to comply therewith, I do not believe this court can substitute its concept of wisdom for that of the directors.

Plaintiff's affidavit indicates that he arbitrarily applied a ten times earnings formula as a standard for valuing the principal assets of the defendant. Defendant's assets consist of the ownership of various stock interests in public utility companies providing gas, electricity, transportation and other services in at least seven states. Certainly this test may be one standard by which the value of such assets is weighed, but it is most assuredly not the only standard to be applied. Indeed, the assets sought to be valued may have such a factual background that the application of such a rule would be misleading and even fraudulent. Although a certain picked class of utility stocks may have an

average value of ten times earnings, nevertheless, as counsel for the stockholders' committee pointed out, it is only an average. The values of the utilities chosen to determine an average may vary widely. Consequently, plaintiff's assumption that this standard of valuing the assets is the only one to be applied is fallacious. The defendant corporation does not say that this arbitrary standard should not be considered. It merely says that it is only one criterion of value to be considered. I am in accord with the defendant's position. Compare generally *In re General Realty & Utilities Corporation,* 29 *Del. Ch.* 483 52 *A.* 2d 6.

We are left then with plaintiff's opinion that the net assets are worth about $82,000,000. This is about $6,500,000 less than the value admittedly necessary if a dividend is to be legally declared under *Section* 34 (*b*). The plaintiff gives only his opinion of the value of the assets. As a basis for qualifying himself to give such opinion, plaintiff mentions his experiences in the investment field. His college education was in the business field, and for about 15 years he has operated an investment business in Wall Street, New York City. He holds official positions in the New York Security Dealers Association. He states that it is his business to know the value of securities, although he overlooked a "clerical error" of $12,375,000, and confused a worthless stock in the defendant's portfolio with stock of another class having a value of about $600,000. Indeed, there is nothing in the plaintiff's papers to show any real familiarity with the corporations whose stocks are owned by the defendant. Plaintiff speaks of the stocks as though the defendant's business was trading in utility stocks. Such is not the case, and in consequence plaintiff loses sight of the value inherent in holding certain blocks of stock which give the defendant working control of such corporations.

Plaintiff also contends that the appraisals relied on by the defendant's directors erroneously took into consideration such factors as the future earnings and prospects of the

stocks owned by the defendant. He urges that such elements may not be considered in determining present value under *Section* 34(*b*). I am unable to agree with plaintiff's contention. The factors mentioned certainly form elements to be considered in determining the present value of stock in a going concern. It is indeed common knowledge that future prospects often constitute a most important factor where present value is sought to be determined.

Plaintiff points out that the reputable accountants who prepared the defendant's balance sheet stated the value of the defendant's assets was subject to such adjustment as might be required under a simplification program called for by the Public Utility Holding Company Act of 1935. From this and other statements plaintiff implies that the accountants were suggesting that the capital assets were overvalued. In my opinion, the statements made by the accountants merely constituted a caveat for their own protection and did not purport to go further. Nor in my opinion does the fact that the defendant applied to the S. E. C. for permission to declare the dividend constitute persuasive evidence that the directors felt that the value of the assets was such that the dividend would actually be paid out of capital.

Thus we have a situation where plaintiff seeks a preliminary injunction to prevent the directors from paying a dividend under *Section* 34(*b*) because he alone values the net assets at about $6,500,000 below the required value, while the defendant's directors have declared the dividend after having been presented with substantial data as to value compiled by admitted experts in the field. This data, along with the corporate records, indicate that the net assets are substantially in excess of the statutory requirement. I purposely refrain from placing too much reliance upon the more elaborate statements contained in defendant's affidavits showing the justification for the action of the directors because I prefer to evaluate the information presented to and the action taken by the directors prior to or at the time

the dividend was declared. The information presented to and the action taken by the directors, when contrasted with plaintiff's case, permits of but one reasonable answer. The plaintiff has failed utterly to make out a showing which would entitle him to a preliminary injunction.

Plaintiff's case comes down to a disagreement with the directors as to value under circumstances where the directors took great care to obtain data on the point in issue, and exercised an informed judgment on the matter. In such a situation, I am persuaded that this court cannot substitute either plaintiff's or its own opinion of value for that reached by the directors where there is no charge of fraud or bad faith. As stated, the process of valuation called for by *Section* 34(*b*) of necessity permits of no one objective standard of value. Having in mind its function, the directors must be given reasonable latitude in ascertaining value. Such being the case, I conclude that the action of the directors in determining that the net assets were worth at least the aggregate amount of the capital represented by the issued and outstanding stock of all classes having preference upon the distribution of assets cannot be disturbed on the showing here made. Consequently, plaintiff is not entitled to a preliminary injunction restraining the payment of the dividend.

An order accordingly will be advised on notice.