SHELL PETROLEUM, INC., f/k/a
SPNV Holdings, Inc., Defendant
Below, Appellant,

v.

Raymond A. SMITH, Edwina A. Tarry,
George William Tarry, as Trustee, Joseph R. Reilly, John Bancroft Webster,
and Edward F. Pohrer, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: Feb. 4, 1992.
Decided: April 23, 1992.

Richard L. Sutton (argued), William O.
LaMotte, III and Robert J. Valihura, Jr.,
Morris, Nichols, Arsht & Tunnell, Wilmington (Cravath, Swaine & Moore, New York
City, of counsel), for appellant.

Clark W. Furlow, Smith, Katzenstein &
Furlow, Thomas P. Preston and John L.
Olsen, Duane, Morris & Heckscher, Wilmington (H. Lee Godfrey (argued), Susman
Godfrey, Houston, Tex., Edward M. Selfe,

Bradley, Arant, Rose & White, Birmingham, Ala., of counsel), for appellees.

Before MOORE, WALSH, JJ., TAYLOR, Judge (sitting by designation pursuant to Del. Const. art. IV, § 12).

MOORE, Justice.

Shell Petroleum, Inc., the successor to SPNV Holdings, Inc. ("Holdings"), appeals a decision of the Court of Chancery awarding the class plaintiffs, all former minority shareholders of Shell Oil Company ("Shell"), damages for material misstatements made to the latter in connection with a short form "freeze-out" merger initiated by Holdings. We agree that the misstatements were material and that Holdings must bear responsibility for them. Accordingly, we affirm.

## I.

In early 1984, Royal Dutch Petroleum Company ("Royal Dutch"), through various subsidiaries, controlled approximately 70% of the outstanding common shares of Shell. On January 24, 1984, Royal Dutch announced its intention to merge Shell into Holdings (now Shell Petroleum, Inc.)[1] by offering the minority $55 per share. However, Shell's board of directors rejected the offer as inadequate.

Royal Dutch then withdrew the merger proposal and initiated a tender offer at $58 per share.[2] As a result of the tender offer, Holdings' ownership interest increased to 94.6% of Shell's outstanding stock. Hold-

ings then initiated a short-form merger pursuant to 8 *Del.C.* § 253.

Under the terms of the short-form merger, Shell's minority stockholders were to receive $58 per share. However, if a shareholder waived his right to seek an appraisal before July 1, 1985, he would receive an extra $2 per share. In conjunction with the short-form merger, Holdings distributed several documents to the minority, including a document entitled "Certain Information About Shell" ("CIAS").

The CIAS included a table of discounted future net cash flows ("DCF") for Shell's oil and gas reserves. However, due to a computer programming error, the DCF failed to account for the cash flows from approximately 295 million barrel equivalents of U.S. proved oil and gas reserves. Shell's failure to include the reserves in its calculations resulted in an understatement of its discounted future net cash flows of approximately $993 million to $1.1 billion or $3.00 to $3.45 per share. Moreover, as a result of the error, Shell stated in the CIAS that there had been a slight decline in the value of its oil and gas reserves from 1984 to 1985. When properly calculated, the value of the reserves had actually increased over that time period.

Shell's minority shareholders sued in the Court of Chancery asserting that the error in the DCF along with other alleged disclosure violations constituted a breach of Holdings' fiduciary "duty of candor".[3] After trial, the Court of Chancery held that the error in the DCF was both material and misleading. Moreover, the trial court con-

---

1. Holdings was formed for the purpose of obtaining the Shell stock owned by minority shareholders. Shell Petroleum, Inc. and Holdings will be referred to simply as Holdings.

2. The tender offer generated a significant amount of litigation regarding the fairness of the offer price and the adequacy of the disclosure materials. *See Joseph v. Shell Oil Company,* Del.Ch., 482 A.2d 335 (1984). The litigation was settled in early 1985. The settlement provided for cash payments to class members of approximately $190 million or $2 per share.

3. Recently, we noted that the term "duty of candor" does not import a unique or special

rule of disclosure. "It represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 Moore, J. (1992). Thus, we considered the term "duty of candor" to be both "confusing and imprecise given the well-established principles and duties of disclosure that otherwise exist." *Id.* at 84. Accordingly, we stated that it is more appropriate to speak of a duty of disclosure based on a materiality standard rather than unhelpful terminology having no well accepted meaning in the disclosure context. *Id.* We do so here.

cluded that Holdings, by virtue of its substantial role in preparing and distributing the disclosure materials, was liable to the minority shareholders for the error. The court then awarded the shareholder class $2 per share.

## II.

We first consider Holdings' argument that the billion dollar understatement of Shell's oil and gas reserves was not material, and therefore, the Court of Chancery erred in finding a breach of fiduciary duty.

## A.

The question whether the disclosures to Shell's minority shareholders were adequate is a mixed one of law and fact, requiring an assessment of the inferences a reasonable shareholder would draw and the significance of those inferences to the individual shareholder. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944–45 (1985); *see also Kahn v. Household Acquisition Corp.*, Del.Supr., 591 A.2d 166, 171 (1991) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Therefore, "this Court has the authority to review the entire record and to make its own findings of fact in a proper case." *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). However, if the findings of the trial judge "are sufficiently supported by the record and are the product of an orderly and logical deductive process, ... we accept them, even though independently we might have reached opposite conclusions." *Id.*

## B.

■ Holdings' duty with respect to disclosure is clear. As the majority shareholder, Holdings bears the burden of showing complete disclosure of all material facts relevant to a minority shareholders' decision whether to accept the short-form merger consideration or seek an appraisal. *Bershad v. Curtiss–Wright Corp.*, Del. Supr., 535 A.2d 840, 846 (1987) (citing *Weinberger v. UOP, Inc.*, Del.Supr., 457

A.2d 701, 703 (1983)). Thus, the question is one of materiality. *Id.* (citing *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 890 (1985)). A fact is considered material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *Rosenblatt*, 493 A.2d at 944); *see also TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. "While it need not be shown that an omission or distortion would have made an investor change his overall view of a proposed transaction, it must be shown that the fact in question would have been relevant to him." *Barkan v. Amsted Industries, Inc.*, Del.Supr., 567 A.2d 1279, 1289 (1989).

## C.

The Court of Chancery concluded that "the understatement of Shell's oil and gas reserves by 294.6 million barrel equivalents, with a value of approximately $1 billion ($3.00–$3.45 per share) ... would have been viewed by a reasonable investor as significantly altering the 'total mix' of information available." *Smith v. Shell Petroleum, Inc.*, Del.Ch., C.A. No. 8395, Hartnett, V.C., slip op. at 41, 1990 WL 84218 (June 19, 1990) ("*Smith*") (citing *Rosenblatt*, 493 A.2d at 944). It is clear from the Vice Chancellor's decision that he applied the proper legal standards and carefully considered the evidence presented. However, Holdings argues that the court's decision was incorrect because: 1) the error was insignificant when viewed in context; 2) the error was not significant enough to affect a shareholder's decision whether to seek an appraisal; and 3) the error was not material because the DCF was only an estimate.

Holdings contends that the billion dollar error was insignificant because it resulted in only a 5.5% understatement in the total discounted cash flows reported. However, the significance of the error is clearly demonstrated by the fact that a Shell executive vice president stated in the *Wall Street Journal* that a 220 million barrel discovery

in the Gulf of Mexico was considered a major find. Thus, it is difficult to accept Holdings' argument that the failure to report cash flows from 295 million barrels was insignificant, when the discovery of 220 million barrels was considered important enough to merit coverage on the first page of the *Wall Street Journal*.[4]

Holdings also argues that a $3 per share error was not significant enough to make a reasonable stockholder change his decision and seek an appraisal. However, the question is not whether the information would have changed the stockholder's decision to accept the merger consideration, but whether "the fact in question would have been relevant to him." *Barkan*, 567 A.2d at 1289. "[T]he real worth of an oil company is centered in its reserves." *Rosenblatt*, 493 A.2d at 941. We cannot agree that a billion dollar understatement of the value of Shell's reserves would have been anything but highly relevant and material to a reasonable stockholder.

Finally, Holdings contends that the DCF is only an estimate of future cash flows and, therefore, it would be unreasonable for a shareholder to conclude that Shell's oil and gas reserves were worth the amount presented in the DCF. In fact, according to Holdings, a reasonable shareholder should anticipate a certain margin of error simply due to the uncertainties inherent in the estimate process.

Although the DCF presents an estimate of future cash flows, a shareholder could reasonably conclude that the DCF was accurately prepared based on all available information. Moreover, a reasonable shareholder could conclude that the 1985 DCF was prepared in a manner consistent with the 1984 DCF. Thus, a comparison of the 1984 and 1985 DCFs should present an accurate indication of whether the value of Shell's reserves was increasing or decreasing. Such was not the case. A comparison of the 1984 and 1985 DCFs inevitably leads

to the erroneous conclusion, as stated in the CIAS, that the value of Shell's reserves had declined. Most importantly, the misleading statement that the value of the reserves had declined was not based upon the inherent inaccuracies of the estimate process, but upon an error made by Shell. The fact that the error was included in a schedule which contained estimates does not diminish its materiality.

In the final analysis, the question is not whether this Court agrees or disagrees with the trial court's decision. Rather, the question is whether the Vice Chancellor's findings are "supported by the record and are the product of an orderly and logical deductive process." *Levitt*, 287 A.2d at 673. After reviewing the record, we conclude that the Vice Chancellor's decision was both supported by the record and well-reasoned.

### III.

Holdings also argues that the Court of Chancery erred in finding it liable for the understatement contained in Shell's disclosure materials. Essentially, Holdings contends that it should not be held liable for an error made by Shell. Holdings argues that the trial court's decision makes it the insurer of the accuracy of the information provided by its subsidiary. This argument is unpersuasive and suggests a misunderstanding of the trial court's decision.

It is undisputed that Holdings, as Shell's majority shareholder, owed a duty to Shell's minority shareholders to disclose information, within its knowledge, which might assist the minority shareholders in responding to the proposed merger. *Kahn*, 591 A.2d at 171. However, Holdings contends that it neither knew nor should have known of the error and, therefore, was under no duty to disclose it. *See Van Gorkom*, 488 A.2d at 864. In response to Holdings' claim that it had no

---

**4.** Holdings attempts to diminish the importance of the story in the *Wall Street Journal* by noting that the discovery involved actual barrels of oil, whereas the DCF only presented estimated cash flows from oil reserves. This argument is unpersuasive. The inherent value of any oil discovery is not the oil itself, but rather, the cash and profits expected to be generated by the oil. Thus, the estimated cash flows from oil and gas reserves are important to a reasonable investor, and a billion dollar understatement of those cash flows would be significant.

reason to know of the error in the DCF, the trial court noted that "Holdings had control over [the DCF's] preparation and sent it to the stockholders." *Smith*, slip op. at 43. Thus, Holdings should have known about the error. Accordingly, Holdings' liability was not premised solely upon its fiduciary duty as a majority shareholder, rather Holdings' liability was based on the substantial role it played in the preparation and distribution of the disclosure materials.

In support of its conclusion that Holdings had control over the preparation and distribution of the disclosure materials, the trial court referred to the deposition testimony of Holdings' lawyer, Steward R. Bross, Jr. ("Bross"), in which he stated that the CIAS was prepared by Shell at Holdings' request.[5] In addition, with Royal Dutch's Chairman L.C. van Wachen presiding as chairman, Shell's board of directors gave Holdings a virtual "blank check" to do whatever Holdings felt necessary in directing Shell's preparation of the disclosure materials.[6] Finally, Holdings organized a series of timetables to coordinate all work related to the disclosure materials. Thus, the record fully supports the trial court's conclusion that Holdings had control over the preparation of the CIAS.[7]

■ It is only logical that a majority shareholder who directs a subsidiary to prepare certain disclosure materials and then distributes those materials to minority shareholders should be held accountable for any errors contained therein. Based upon the significant role played by Holdings in the preparation and distribution of the disclosure materials, we find the decision of the Court of Chancery finding Holdings liable for the error in the DCF to be manifestly correct.

## IV.

■ In addition to the billion dollar understatement of Shell's oil and gas reserves, the trial court found two other minor disclosure violations in the 1985 disclosure documents which were "indicative of a conscious decision of [Holdings] to be less than candid." *Smith*, slip op. at 49. The minor disclosure violations included: 1) the failure to update Shell's 1984 asset evaluations; and 2) the failure to disclose that Morgan Stanley's valuation assumptions differed from Shell's assumptions. Although not the basis for the trial court's decision that Holdings breached its fiduciary duty of disclosure, it appears that the two minor violations were considered when determining damages.

Holdings argues that the Court of Chancery erred in concluding that the failure to update the 1984 asset evaluations or disclose Morgan Stanley's valuation assumptions constituted separate disclosure violations. However, because the trial court's determination that Holdings breached its duty of disclosure is adequately supported by the billion dollar understatement of Shell's oil and gas reserves, we find it is

---

5. In his deposition testimony, Bross stated:

   I played a substantial role in the preparation of the Information Circular. I played a substantial role in the preparation of the formal notice, which is a one-page document. We—insofar as the Certain Information About Shell was concerned, that was prepared by Shell Oil *at our request*.
   (Emphasis added).

6. The following resolution was unanimously adopted by Shell's Board of Directors:

   RESOLVED, That the proper officers of the Company be, and each of them hereby is, authorized and empowered, if SPNV Holdings, Inc. effects a merger of the Company under Section 253 of the Delaware Corporation Law, i) to take any and all action with respect to persons who were shareholders immediately before the merger, including furnishing notice of the merg-

er, rights of appraisal, the procedures concerning payment for shares, and certain other information and ii) *to permit SPNV Holdings, Inc. to perform any part of such action, in the name and on behalf of the Company, as is deemed or considered necessary, appropriate, advisable or prudent.*
(Emphasis added).

7. Holdings also argues that the decision of the trial court finding it liable for the error was incorrect because the indemnification agreement between Shell and Holdings only provided for indemnification for losses, claims and expenses "arising out of any appraisal proceeding in connection with the merger." However, because the trial court premised Holdings' liability upon the breach of its fiduciary duty of disclosure, rather than the indemnification agreement, Holdings' argument is without merit.

unnecessary to consider Holdings' arguments regarding the minor disclosure violations.

Finally, the finding of the two minor disclosure violations did not alter the trial court's decision that Holdings breached its duty of disclosure. At most, the other disclosure violations were considered by the trial court when ascertaining damages. In determining the appropriate remedy for a disclosure violation, the Court of Chancery has broad discretion. *Weinberger*, 457 A.2d at 714. We conclude that the trial court's consideration of Holdings' less than candid approach to disclosure was not an abuse of that discretion.

### V.

 Holdings contends that the Court of Chancery's decision to award interest from the date of the filing of the amended complaint was an abuse of discretion. We disagree.

The trial court initially determined that interest should be awarded from June 19, 1990, the date of its decision finding a breach of fiduciary duty. However, the court subsequently modified its decision and held that interest should be awarded from September 27, 1989, the date the amended complaint was filed asserting the breach of fiduciary duty claim related to the understatement of Shell's oil and gas reserves.

Holdings contends that the trial court's deviation from the procedure adopted by the Court of Chancery in *Weinberger* amounts to an abuse of discretion.[8] *See Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642, Brown, C. (Jan. 30, 1985), *aff'd,* Del. Supr., 497 A.2d 792 (1985) (ORDER). This argument is without merit. *Weinberger* did not purport to establish a universal standard for interest awards. Rather, the Court of Chancery in *Weinberger,* in its discretion, based upon the facts of that case, decided to award interest from the

date of this Court's finding of a breach of fiduciary duty.

Here, the trial court awarded interest from the date of the filing of the amended complaint. Thus, the court considered it appropriate to grant interest for the entire time Holdings knew of the error. This Court has previously held that the Court of Chancery is empowered to grant such relief "as the facts of a particular case may dictate." *Weinberger*, 457 A.2d at 714. Holdings failed to offer any reason why the trial court's decision amounted to an abuse of its discretion.

Accordingly, the judgment of the Court of Chancery is AFFIRMED.

---

**8.** In *Weinberger,* the Court of Chancery awarded interest from the date of this Court's decision finding that the defendants had breached their duty of disclosure. *Weinberger v. UOP, Inc.,*

Del.Ch., C.A. No. 5642, Brown, C. (Jan. 30, 1985), *aff'd,* Del.Supr., 497 A.2d 792 (1985) (ORDER) (citing *Weinberger v. UOP, Inc.,* 457 A.2d 701 (1983)).