Larry F. KLANG, on behalf of himself and all others similarly situated, Plaintiff Below, Appellant,

v.

SMITH'S FOOD & DRUG CENTERS, INC., Jeffrey P. Smith, Richard D. Smith, Fred L. Smith, Sean D. Smith, Robert D. Bolinder, Kenneth A. White, Douglas John Tigert, Stuart Rosenthal, Ray V. Rose, Duane Peters, Nicole Miller, Allen P. Martindale, Delonne Anderson, The Yucaipa Companies, Ronald Burkle, Smitty's Supermarkets, Inc., and Cactus Acquisition, Inc., Defendants Below, Appellees.

No. 210, 1997.

Supreme Court of Delaware.

Submitted: Sept. 11, 1997.

Decided: Nov. 7, 1997.

Revised: Dec. 1, 1997.

William Prickett and Ronald A. Brown, Jr., (argued), of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; A.B. Conant, Jr., and Raymond P. Harris, Jr., of counsel, of Conant, Whittenburg, French & Schachter, P.C., Dallas, TX, for Appellant.

Jesse A. Finkelstein, of Richards, Layton & Finger, Wilmington; Bruce D. Angiolillo (argued), Jeffrey E. Ostrow and Harrison J. Frahn IV, of counsel, of Simpson, Thacher & Bartlett, New York City; and Hugh Steven Wilson and James W. Baker, of counsel, of Latham & Watkins, San Diego, CA, for Appellees.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

This appeal calls into question the actions of a corporate board in carrying out a merger and self-tender offer. Plaintiff in this purported class action alleges that a corporation's repurchase of shares violated the statutory prohibition against the impairment of capital. Plaintiff also claims that the directors violated their fiduciary duty of candor by failing to disclose material facts prior to seeking stockholder approval of the transactions in question.

 No corporation may repurchase or redeem its own shares except out of "surplus," as statutorily defined, or except as expressly authorized by provisions of the statute not relevant here. Balance sheets are not, however, conclusive indicators of surplus or a lack thereof. Corporations may revalue assets to show surplus, but perfection in that process is not required. Directors have reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud.

We hold that, on this record, the Court of Chancery was correct in finding that there was no impairment of capital and there were no disclosure violations. Accordingly, we affirm.

### Facts

Smith's Food & Drug Centers, Inc. ("SFD") is a Delaware corporation that owns and operates a chain of supermarkets in the Southwestern United States. Slightly more than three years ago, Jeffrey P. Smith, SFD's Chief Executive Officer, began to entertain suitors with an interest in acquiring SFD. At the time, and until the transactions at issue, Mr. Smith and his family held common and preferred stock constituting 62.1% voting control of SFD. Plaintiff and the class he purports to represent are holders of common stock in SFD.

On January 29, 1996, SFD entered into an agreement with The Yucaipa Companies ("Yucaipa"), a California partnership also active in the supermarket industry. Under the agreement, the following would take place:

(1) Smitty's Supermarkets, Inc. ("Smitty's"), a wholly-owned subsidiary of Yucaipa that operated a supermarket chain in Arizona, was to merge into Cactus Acquisition, Inc. ("Cactus"), a subsidiary of SFD, in exchange for which SFD would deliver to Yucaipa slightly over 3 million newly-issued shares of SFD common stock;

(2) SFD was to undertake a recapitalization, in the course of which SFD would assume a sizable amount of new debt, retire old debt, and offer to repurchase up to fifty percent of its outstanding shares (other than those issued to Yucaipa) for $36 per share; and

(3) SFD was to repurchase 3 million shares of preferred stock from Jeffrey Smith and his family.

SFD hired the investment firm of Houlihan Lokey Howard & Zukin ("Houlihan") to examine the transactions and render a solvency opinion. Houlihan eventually issued a report to the SFD Board replete with assur-

ances that the transactions would not endanger SFD's solvency, and would not impair SFD's capital in violation of 8 *Del.C.* § 160. On May 17, 1996, in reliance on the Houlihan opinion, SFD's Board determined that there existed sufficient surplus to consummate the transactions, and enacted a resolution proclaiming as much. On May 23, 1996, SFD's stockholders voted to approve the transactions, which closed on that day. The self-tender offer was over-subscribed, so SFD repurchased fully fifty percent of its shares at the offering price of $36 per share.

### Disposition in the Court of Chancery

■ This appeal came to us after an odd sequence of events in the Court of Chancery. On May 22, 1996, the day before the transactions closed, plaintiff Larry F. Klang filed a purported class action in the Court of Chancery against Jeffrey Smith and his family, various members of the SFD Board, Yucaipa, Yucaipa's managing general partner Ronald W. Burkle, Smitty's and Cactus. On May 30, 1996, plaintiff filed an amended complaint as well as a motion to have the transactions voided or rescinded, advancing a variety of claims, only two of which are before us on appeal. First, he contended that the stock repurchases violated 8 *Del.C.* § 160 [1] by impairing SFD's capital. Second, he alleged that SFD's directors violated their fiduciary duties by failing to disclose material facts relating to the transactions prior to obtaining stockholder approval.

After defendants answered the amended complaint, plaintiff took full discovery. The Court of Chancery heard plaintiff's motion to have the transactions rescinded, and released a Memorandum Opinion dismissing plaintiff's claims in full. [2] Confusion arose out of the last sentence of the trial court's opinion, which reads, "Defendants' motion to dismiss is granted in its entirety." [3] Defendants never filed a motion to dismiss. In effect, the Court of Chancery awarded full relief that was never requested, by granting a motion to dismiss that was never filed.

We find that this procedural error was harmless in this case. Although there should have been a more punctilious approach to procedural requirements, plaintiff was at fault for failing to draw to the trial court's attention an obvious mistake that could easily have been cured. It is clear, however, that plaintiff had a full opportunity to present his case, and that the trial court had before it a fully-developed factual record. Therefore, we affirm, notwithstanding this language in the Court of Chancery's opinion.

### Plaintiff's Capital–Impairment Claim

■ A corporation may not repurchase its shares if, in so doing, it would cause an impairment of capital, unless expressly authorized by Section 160. [4] A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's "surplus," defined by 8 *Del.C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock. [5]

1. Section 160(a) provides:
 (a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; provided, however, that no corporation shall:
 (1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock, or, if no shares entitled to such a preference are outstanding, any of its own shares, if such shares will be retired upon their acquisition and the capital of the corpo-

ration reduced in accordance with §§ 243 and 244 of this title.

2. *Klang v. Smith's Food & Drug Centers, Inc., at al.*, Del.Ch., C.A. No. 15012, mem. op., 1997 WL 257463 (May 13, 1997) ("Mem.Op.").

3. *Id.* at 43.

4. The provisions of Section 160 permitting a corporation to purchase its shares out of capital under circumstances are not implicated in this case. *See* n.1 *supra.*

5. Section 154 provides, "Any corporation may, by resolution of its board of directors, determine that only a part of the consideration ... received by the corporation for ... its capital stock ... shall be capital.... The excess ... of the net assets of the corporation over the amount so

Plaintiff asked the Court of Chancery to rescind the transactions in question as violative of Section 160. As we understand it, plaintiff's position breaks down into two analytically distinct arguments. First, he contends that SFD's balance sheets constitute conclusive evidence of capital impairment. He argues that the negative net worth that appeared on SFD's books following the repurchase compels us to find a violation of Section 160. Second, he suggests that even allowing the Board to "go behind the balance sheet" to calculate surplus does not save the transactions from violating Section 160. In connection with this claim, he attacks the SFD Board's off-balance-sheet method of calculating surplus on the theory that it does not adequately take into account all of SFD's assets and liabilities. Moreover, he argues that the May 17, 1996 resolution of the SFD Board conclusively refutes the Board's claim that revaluing the corporation's assets gives rise to the required surplus. We hold that each of these claims is without merit.

### SFD's balance sheets do not establish a violation of 8 Del.C. § 160

In an April 25, 1996 proxy statement, the SFD Board released a pro forma balance sheet showing that the merger and self-tender offer would result in a deficit to surplus on SFD's books of more than $100 million. A balance sheet the SFD Board issued shortly after the transactions confirmed this result. Plaintiff asks us to adopt an interpretation of 8 Del.C. § 160 whereby balance-sheet net worth is controlling for purposes of determining compliance with the statute.[6] Defendants do not dispute that SFD's books showed a negative net worth in the wake of its transactions with Yucaipa, but argue that corporations should have the presumptive right to revalue assets and liabilities to comply with Section 160.

Plaintiff advances an erroneous interpretation of Section 160. We understand that the books of a corporation do not necessarily reflect the current values of its assets and liabilities. Among other factors, unrealized appreciation or depreciation can render book numbers inaccurate. It is unrealistic to hold that a corporation is bound by its balance sheets for purposes of determining compliance with Section 160. Accordingly, we adhere to the principles of *Morris v. Standard Gas & Electric Co.*[7] allowing corporations to revalue properly its assets and liabilities to show a surplus and thus conform to the statute.

It is helpful to recall the purpose behind Section 160. The General Assembly enacted the statute to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation.[8] That a corporation has not yet realized or reflected on its balance sheet the appreciation of assets is irrelevant to this concern. Regardless of what a balance sheet that has not been updated may show, an actual, though unrealized, appreciation reflects real economic value that the corporation may borrow against or that creditors may claim or levy upon. Allowing corporations to revalue assets and liabilities to reflect current realities complies with the statute and serves well the policies behind this statute.

### The SFD Board appropriately revalued corporate assets to comply with 8 Del.C. § 160.

Plaintiff contends that SFD's repurchase of shares violated Section 160 even without regard to the corporation's balance sheets. Plaintiff claims that the SFD Board was not entitled to rely on the solvency opinion of Houlihan, which showed that the transactions would not impair SFD's capital given a revaluation of corporate assets. The argument is that the methods that underlay the solvency opinion were inappropriate as a matter of law

determined to be capital shall be surplus. Net assets means the amount by which total assets exceed total liabilities. Capital and surplus are not liabilities for this purpose."

6. *See, e.g., Wright v. Heizer Corp.*, N.D.Ill., 503 F.Supp. 802, 810 (1980); *In re Kettle of Fried*

*Chicken of America, Inc.*, 6th Cir., 513 F.2d 807, 811 (1975).

7. *Morris v. Standard Gas & Electric Co.*, Del.Ch., 63 A.2d 577 (1949).

8. *See Pasotti v. United States Guardian Corp.*, Del.Ch., 156 A. 255, at 257 (1931).

because they failed to take into account all of SFD's assets and liabilities. In addition, plaintiff suggests that the SFD Board's resolution of May 17, 1996 itself shows that the transactions impaired SFD's capital, and that therefore we must find a violation of 8 Del.C. § 160. We disagree, and hold that the SFD Board revalued the corporate assets under appropriate methods. Therefore the self-tender offer complied with Section 160, notwithstanding errors that took place in the drafting of the resolution.

On May 17, 1996, Houlihan released its solvency opinion to the SFD Board, expressing its judgment that the merger and self-tender offer would not impair SFD's capital. Houlihan reached this conclusion by comparing SFD's "Total Invested Capital" of $1.8 billion—a figure Houlihan arrived at by valuing SFD's assets under the "market multiple" approach—with SFD's long-term debt of $1.46 billion. This comparison yielded an approximation of SFD's "concluded equity value" equal to $346 million, a figure clearly in excess of the outstanding par value of SFD's stock. Thus, Houlihan concluded, the transactions would not violate 8 Del.C. § 160.

■ Plaintiff contends that Houlihan's analysis relied on inappropriate methods to mask a violation of Section 160. Noting that 8 Del.C. § 154 defines "net assets" as "the amount by which total assets exceeds total liabilities," plaintiff argues that Houlihan's analysis is erroneous as a matter of law because of its failure to calculate "total assets" and "total liabilities" as separate variables. In a related argument, plaintiff claims that the analysis failed to take into account all of SFD's liabilities, i.e., that Houlihan neglected to consider current liabilities in its comparison of SFD's "Total Invested Capital" and long-term debt. Plaintiff contends that the SFD Board's resolution proves that adding current liabilities into the mix shows a violation of Section 160. The resolution declared the value of SFD's assets to be $1.8 billion, and stated that its "total liabilities" would not exceed $1.46 billion after the transactions with Yucaipa. As noted, the $1.46 billion figure described only the value of SFD's long-term debt. Adding in SFD's

$372 million in current liabilities, plaintiff argues, shows that the transactions impaired SFD's capital.

We believe that plaintiff reads too much into Section 154. The statute simply defines "net assets" in the course of defining "surplus." It does not mandate a "facts and figures balancing of assets and liabilities" to determine by what amount, if any, total assets exceeds total liabilities.[9] The statute is merely definitional. It does not require any particular method of calculating surplus, but simply prescribes factors that any such calculation must include. Although courts may not determine compliance with Section 160 except by methods that fully take into account the assets and liabilities of the corporation, Houlihan's methods were not erroneous as a matter of law simply because they used Total Invested Capital and long-term debt as analytical categories rather than "total assets" and "total liabilities."

We are satisfied that the Houlihan opinion adequately took into account all of SFD's assets and liabilities. Plaintiff points out that the $1.46 billion figure that approximated SFD's long-term debt failed to include $372 million in current liabilities, and argues that including the latter in the calculations dissipates the surplus. In fact, plaintiff has misunderstood Houlihan's methods. The record shows that Houlihan's calculation of SFD's Total Invested Capital is already net of current liabilities. Thus, subtracting long-term debt from Total Invested Capital does, in fact, yield an accurate measure of a corporation's net assets.

■ The record contains, in the form of the Houlihan opinion, substantial evidence that the transactions complied with Section 160. Plaintiff has provided no reason to distrust Houlihan's analysis. In cases alleging impairment of capital under Section 160, the trial court may defer to the board's measurement of surplus unless a plaintiff can show that the directors "failed to fulfill their duty to evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect

9. *See Farland v. Wills,* Del.Ch., 1 Del.J.Corp.L. 467, 475 (1975).

present values."[10] In the absence of bad faith or fraud on the part of the board, courts will not "substitute [our] concepts of wisdom for that of the directors."[11] Here, plaintiff does not argue that the SFD Board acted in bad faith. Nor has he met his burden of showing that the methods and data that underlay the board's analysis are unreliable or that its determination of surplus is so far off the mark as to constitute actual or constructive fraud.[12] Therefore, we defer to the board's determination of surplus, and hold that SFD's self-tender offer did not violate 8 Del.C. § 160.

■ On a final note, we hold that the SFD Board's resolution of May 17, 1996 has no bearing on whether the transactions conformed to Section 160. The record shows that the SFD Board committed a serious error in drafting the resolution: the resolution states that, following the transactions, SFD's "total liabilities" would be no more than $1.46 billion. In fact, that figure reflects only the value of SFD's long-term debt. Although the SFD Board was guilty of sloppy work, and did not follow good corporate practices, it does not follow that Section 160 was violated. The statute requires only that there exist a surplus after a repurchase, not that the board memorialize the surplus in a resolution. The statute carves out a class of transactions that directors have no authority to execute, but does not, in fact, require *any* affirmative act on the part of the board. The SFD repurchase would be valid in the absence of any board resolution. A mistake in documenting the surplus will not negate the substance of the action, which complies with the statutory scheme.

### Plaintiff's Disclosure Claims

■ When seeking stockholder action, directors must disclose all material reasonably available facts.[13] A material fact is one that a reasonable stockholder would find relevant in deciding how to vote.[14] It is not necessary that a fact would change how a stockholder would vote. It is necessary only that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available."[15] Directors must also disclose facts that, standing alone, may not be material if their omission in light of other facts disclosed would cause stockholders to be misled.[16]

Plaintiff advances four nondisclosure claims against the SFD Board. He argues that the SFD directors violated their fiduciary duty of candor by failing to disclose: (1) "equity valuations" that Houlihan used in rendering its solvency opinion, (2) the amount of SFD's pre- and post-transaction surplus, (3) the decision of the SFD Board to alter the financing of the merger and self-tender by eliminating $75 million in newly-issued preferred stock and providing for an additional $75 million in debt, and (4) the manner in which defendants arrived at the $36 per share self-tender price.

■ Whether a board's disclosures to stockholders are adequate is a mixed question of law and fact, "requiring an assessment of the inferences a reasonable shareholder would draw and the significance of those inferences to the individual shareholders."[17] If the trial court's findings "are sufficiently supported by the record and are the

**10.** *Morris,* 63 A.2d at 582.

**11.** *Id.* at 583.

**12.** We interpret 8 *Del.C.* § 172 to entitle boards to rely on experts such as Houlihan to determine compliance with 8 *Del.C.* § 160. Plaintiff has not alleged that the SFD Board failed to exercise reasonable care in selecting Houlihan, nor that rendering a solvency opinion is outside Houlihan's realm of competence. *Compare* 8 *Del.C.* § 141(e) (providing that directors may rely in good faith on records, reports, experts, etc.).

**13.** *Loudon v. Archer–Daniels–Midland Company,* Del.Supr., 700 A.2d 135, 143 (1997); *Arnold v.*

*Society for Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1276–77 (1994); *Stroud v. Grace,* Del. Supr., 606 A.2d 75, 84 (1992).

**14.** *Barkan v. Armsted Indus., Inc.,* Del.Supr., 567 A.2d 1279, 1289 (1989).

**15.** *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

**16.** *Arnold,* 650 A.2d at 1281.

**17.** *Shell Petroleum, Inc. v. Smith,* Del.Supr., 606 A.2d 112, 114 (1992).

product of an orderly and logical deductive process, ... we will accept them, even though independently we might have reached opposite conclusions." [18]

### Houlihan's equity valuations were not material

■ An "equity valuation" is an accounting, rather than a legal or economic, concept. Houlihan derived equity valuations of SFD in the course of rendering its solvency opinion. Plaintiff contends that the SFD Board should have disclosed the equity valuations prior to obtaining stockholder approval of the merger and self-tender offer. Plaintiff claims that Houlihan's equity valuations were material as indicators of SFD's "economic" or "intrinsic" value. At the same time, plaintiff acknowledges that Houlihan did not intend its equity valuations to serve as predictors of the market price of SFD shares, and that defendants neither accepted them as such, nor used the equity valuations to derive the price for the self-tender offer.

In *Barkan* [19] and again in *Citron v. Fairchild Camera & Instrument,* [20] we expressed our reluctance to force disclosure of data generated solely for accounting purposes. In *Barkan,* we held that an estimate of a corporation's "liquidation value" prepared as part of a capital-impairment test was not material. [21] Similarly, in *Citron* we held that valuation estimates "prepared primarily for accounting purposes rather than for establishing the fair market value of [the corporation's] share" were immaterial. [22] The holding in both cases was premised upon the sentiment that figures generated for purely accounting purposes are useless predictors of market value, and are at least as likely to mislead stockholders as to enlighten them. In light of *Barkan* and *Citron,* we defer to the finding of the Court of Chancery that Houlihan's equity valuations would not alter

the "total mix" of information available to SFD's stockholders. [23]

### The amount of pre- and post-transaction surplus was not material

For similar reasons, we hold that the SFD Board was not obliged to disclose the amount of pre- and post-transaction surplus. Surplus is a statutory construct that bears no necessary relation to the financial health of a corporation. And as in *Barkan* and *Citron,* we are skeptical that the exact amount of surplus would have been relevant to the average SFD stockholder in deciding how to vote on the merger and self-tender offer.

Plaintiff relies on *In re Armsted Indus. Inc. Litig.* [24] There, the Court of Chancery dismissed a claim that a board should have disclosed the amount of pre-transaction surplus, stating that "the truly material piece of information, the amount of surplus left after the repurchase, is disclosed as amounting to $62 million." [25] The *Armsted* Court's meaning is unclear to us. If the Court of Chancery was suggesting there that the $62 million figure is material, we disapprove of that holding for the reasons mentioned above. If one were also to read the case to imply that it is simply material that the figure is above zero, we disapprove that suggestion as well. A corporation should not have to disclose that its transactions are not in violation of 8 *Del.C.* § 160. Most reasonable stockholders would assume that corporations do not knowingly violate the Delaware General Corporation Law. Thus, it would add nothing to the total mix of information for a corporation to proclaim, "what we are doing right now is legal."

■ Accordingly, we hold that calculating surplus prior to executing a repurchase trig-

18. *Id.*

19. *Barkan,* 567 A.2d at 1289.

20. Del.Supr., 569 A.2d 53 (1989).

21. 567 A.2d at 1289.

22. 569 A.2d at 70.

23. *Levitt,* 287 A.2d at 673.

24. Del.Ch., C.A. No. 8224, letter op. (Aug. 10, 1987).

25. *Id.*

gers no disclosure obligations on the part of the board.

### The substitution of $75 million of debt for $75 million of preferred stock was not material

██ SFD's proxy statement of April 25, 1996 stated that the SFD Board "anticipated" financing a $575 million portion of the transactions with Yucaipa by issuing $500 million in notes and $75 million in preferred stock. This method of financing changed prior to the vote of SFD stockholders. The change eliminated the $75 million in preferred stock and tacked on an additional $75 million in debt. Plaintiff argues the SFD Board should have disclosed this change prior to the stockholder vote.

The importance of this change in financing is subject to varying interpretations. The record shows that the adjustment of the financial package resulted in a mere 0.2% increase in SFD's total liabilities. On the other hand, plaintiff is able to massage the numbers to present a somewhat different picture. The additional debt load, plaintiff points out, amounts to a full $5 per share. Meanwhile, long-term debt and interest expense climb 6% and 7%, respectively, as a result of the change in financing. In light of this conflicting evidence on materiality, we defer to the finding of the Court of Chancery that the alteration of the financing package was not material.[26]

### The SFD Board adequately disclosed the source of the self-tender offer

The SFD proxy statement stated that Yucaipa proposed the $36 per-share price used in the self-tender offer. Plaintiff argues that this constituted inadequate disclosure of how the board arrived at the price, in light of evidence suggesting alternative sources. For instance, the record contains the testimony of one of SFD's outside directors that the tender-offer price derived from a Goldman, Sachs valuation of SFD, rather than simply from Yucaipa's suggestion. On the other hand, the record is replete with testimony that the price was Yucaipa's and not Goldman's.

The Court of Chancery made a judgment that the SFD Board made adequate disclosure.[27] We have deferred to the trial court's finding that the tender-offer price was proposed by Yucaipa and not SFD's investment bankers. Accordingly, we affirm the Court of Chancery's dismissal of this claim, as plaintiff has offered no evidence that the SFD Board's disclosure of that fact is inadequate.

The judgment of the Court of Chancery is affirmed.

---

**26.** We also note that SFD disclosed the financing change in SEC filings made well in advance of the stockholder vote, and that the April 25, 1996 proxy statement expressly incorporates by reference all such filings. While we need not decide whether this alone constitutes adequate disclo-

sure, we reject plaintiff's argument that the change in financing is per se material because it triggered SEC disclosure requirements.

**27.** *See* Mem.Op. at 29.