SV INVESTMENT PARTNERS, LLC, Schroder Ventures U.S. Fund L.P. 1, Schroder Ventures U.S. Fund L.P. 2, Sitco Nominees, Ltd. VC 04001, and SV (Nominees) Limited, Plaintiffs,

v.

THOUGHTWORKS, INC.

C.A. No. 2724–VCL.

Court of Chancery of Delaware.

Submitted: Sept. 8, 2010.
Decided: Nov. 10, 2010.

See also 902 A.2d 745.

---

Martin S. Lessner, Danielle Gibbs, Tammy L. Mercer, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Daniel M. Abuhoff, Justin P. Smith, Eliza Sporn Fromberg, Debevoise & Plimpton LLP, New York, New York; Attorneys for Plaintiffs.

Kenneth J. Nachbar, Jeffrey R. Wolters, Megan Ward Cascio, Christine Dealy Haynes, Eric S. Wilensky, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Attorneys for Defendant.

## OPINION

LASTER, Vice Chancellor.

The plaintiffs are a group of affiliated investment funds and their advisor, SV Investment Partners, LLC (collectively, "SVIP"). In 2000, they purchased over 94% of the Series A Preferred Stock (the "Preferred Stock") issued by the defendant ThoughtWorks, Inc. ("ThoughtWorks" or the "Company"). The amended and restated certificate of incorporation of ThoughtWorks dated April 5, 2000 (the "Charter") granted the holders of the Preferred Stock the right to have their stock redeemed "for cash out of any funds legally available therefor" beginning five years after issuance. SVIP first exercised its redemption right in 2005.

ThoughtWorks does not have and cannot obtain the cash to redeem the Preferred Stock in full. Instead, each quarter, its board of directors (the "Board") carefully evaluates the Company's finances to determine (i) whether ThoughtWorks has surplus from which a redemption could be made, (ii) whether ThoughtWorks has or could readily obtain cash for a redemption, and (iii) whether a redemption would endanger the Company's ability to continue as a going concern. Over sixteen quarters, the Board has redeemed Preferred Stock on eight separate occasions. A total of 222,802 shares have been redeemed with a total value of $4.1 million.

SVIP objects to the Board's periodic approach. According to SVIP, the term "funds legally available" simply means "surplus." SVIP presented an expert at trial who opined that ThoughtWorks has surplus of $68—$137 million. SVIP argues that while ThoughtWorks may not have cash or the ability to get it, it nevertheless has "funds legally available" and must redeem the Preferred Stock. Because ThoughtWorks has failed to do so, SVIP believes itself entitled to a judgment for the aggregate redemption price. As of April 5, 2010, that amount was $66,906,539.

SVIP's theory breaks down because the phrase "funds legally available" is not equivalent to "surplus." A corporation can have "funds" and lack "surplus," or have "surplus" and lack "funds." The binding constraint on ThoughtWorks' ability to redeem the Preferred Stock is a lack of funds and the concomitant risk that a significant redemption will render the Company insolvent. An unbroken line of decisional authority dating back to the late nineteenth century prohibits a corporation from redeeming shares when the payment would render the corporation insolvent. Even assuming that SVIP were correct and ThoughtWorks could be deemed to have "surplus," SVIP has not shown that ThoughtWorks has "funds legally available." Judgment is therefore entered in favor of ThoughtWorks and against SVIP.

## I. FACTUAL BACKGROUND

The following factual findings have been made after a two-day trial. I also have relied on the factual findings made in a prior decision involving the parties, which are res judicata. *See ThoughtWorks, Inc. v. SV Inv. P'rs, LLC,* 902 A.2d 745 (Del.

Ch.2006) (the *Working Capital Decision*).

## A. The "Brand Of Outstanding Talent"

Roy Singham founded ThoughtWorks in 1993. The Company describes itself as an information technology professional services firm that develops and delivers custom business software applications and provides related consulting services. Headquartered in Chicago, ThoughtWorks provides services to clients throughout the United States and, through subsidiaries, in various parts of the world. Singham owns approximately 94% of ThoughtWorks' common stock.

Singham created ThoughtWorks to establish "a prestige brand of outstanding talent" in the software consulting industry. To achieve this goal, he fostered a "secret sauce culture" that would appeal to the very best software developers, who, in his estimation, are ten to twenty times more productive than average software developers. ThoughtWorks places tremendous emphasis on recruiting elite professionals and providing them with challenging and intellectually stimulating work. The Company's employees, known as "ThoughtWorkers," are its most valuable asset.

The nature of ThoughtWorks' business makes for volatile cash flows. ThoughtWorks' engagements are typically short-term. Although some clients have engaged ThoughtWorks on multiple occasions over the years, each engagement typically lasts three to six months, does not automatically renew, and is subject to cancellation on as little as fifteen-days' notice. ThoughtWorkers arrive at the scene, solve the problem, and move on. As a result, ThoughtWorks' ability to forecast cash flows accurately is limited, and ThoughtWorks consistently failed to meet its forecasts every year through 2008.

Additionally, ThoughtWorks' business tends to be hyper-cyclical. In a downturn, clients terminate ThoughtWorks' contracts before laying off their own employees. In an upturn, clients engage ThoughtWorks before committing to new permanent hires. The business is also seasonal, largely due to ThoughtWorkers and clients taking holiday vacations. ThoughtWorks' slow period runs from November to January, causing the first calendar quarter to be a low point for cash flow.

Because of the volatility in its business, ThoughtWorks' management historically has tried to maintain a cash cushion that will enable the firm to ride out unexpected revenue shortfalls and seasonal lows. This is not to suggest that management has sought (much less been able) to amass a war chest. Rather, management prudently tries to keep some funds on hand so that checks don't bounce during a dry spell.

## B. SVIP Invests In ThoughtWorks.

In 1999, ThoughtWorks began to consider an initial public offering. ThoughtWorks retained an investment bank, S.G. Cowen Securities Corporation, for advice. Having an existing venture capital investor was thought to enhance a new issuer's credibility. ThoughtWorks and S.G. Cowen therefore prepared a confidential offering memorandum for a $25 million private equity investment.

SVIP received the offering memorandum and liked the ThoughtWorks opportunity. In contrast to the stereotypical dot-com concept, ThoughtWorks had a seven-year track record of revenue growth and profitability, and its customers consisted primarily of blue-chip, Fortune 1000 firms. While SVIP recognized that it was "paying a full valuation for the business," the firm believed that the deal could "provide attractive returns on reasonably (and comparatively) conservative exit assumptions."

SVIP saw the "potential to achieve exceptional returns" if then-current market valuations held. As SVIP noted in its investment recommendation, ThoughtWorks "[c]ould be an early IPO in a market which has recently seen some extraordinary valuations."

When negotiating the terms of SVIP's investment, both SVIP and ThoughtWorks anticipated an IPO within a year or two. They also discussed redemption rights for SVIP in case no IPO materialized. The ThoughtWorks offering memorandum proposed a redemption right after seven years, with the payments made in twelve quarterly installments. SVIP countered with a redemption right after four years, then softened that demand to redemption after five years. ThoughtWorks proposed a two-year payout period. SVIP rejected that term. The parties compromised on a redemption right after five years, subject both to the legal availability of funds and to a one-year working capital carve-out.

On April 5, 2000, SVIP invested $26.6 million in ThoughtWorks in exchange for 2,970,917 shares of the Preferred Stock. Another 167,037 shares were purchased by eighteen individuals who are not parties to this action.

## C. The Pertinent Terms Of The Preferred Stock

The holders of the Preferred Stock are entitled to receive cumulative cash dividends at a rate of 9% per annum, compounded semi-annually and accruing semi-annually in arrears. In any liquidation, dissolution, or winding up of the Company, the Preferred Stock is entitled to a liquidation preference equal to the initial purchase price of $8.95 per share (adjusted for any stock dividends, splits, recapitalizations, or consolidations) plus all accrued and unpaid dividends, plus an amount equal to what the Preferred Stock would receive in liquidation assuming it were converted into common stock and shared ratably with the common.

Critically for the current case, Article IV(B), Section 4(a) of the Charter sets out the Preferred Stock's redemption right. It states:

> On the date that is the fifth anniversary of the Closing Date ..., if, prior to such date, the Company has not issued shares of Common Stock to the public in a Qualified Public Offering ... each holder of Preferred Stock shall be entitled to require the Corporation to redeem for cash out of any funds legally available therefor and which have not been designated by the Board of Directors as necessary to fund the working capital requirements of the Corporation for the fiscal year of the Redemption Date, not less than 100% of the Preferred Stock held by each holder on that date. Redemptions of each share of Preferred Stock made pursuant to this Section 4 shall be made at the greater of (i) the Liquidation Price and (ii) the Fair Market Value (as determined pursuant to Section 4(e) below) of the Preferred Stock.

Charter art. IV(B), § 4(a) (the "Redemption Provision"). The Redemption Provision contains two limitations on the Company's obligation "to redeem for cash." First, the redemption can only be "out of any funds legally available therefor." Second, the provision excludes funds "designated by the Board of Directors as necessary to fund the working capital requirements of the Corporation for the fiscal year of the Redemption Date."

Article IV also addresses what happens if "funds of the Corporation legally and otherwise available for redemption pursuant to Section 4(a)" are "insufficient to redeem all the Preferred Stock required to be redeemed." In that event,

funds to the extent so available shall be used for such purpose and the Corporation shall effect such redemption pro rata according to the number of shares held by each holder of Preferred Stock. The redemption requirements provided hereby shall be continuous, so that if at any time after the Redemption Date such requirements shall not be fully discharged, without further action by any holder of Preferred Stock, funds available pursuant to Section 4(a) shall be applied therefor until such requirements are fully discharged.

Charter art. IV(B), § 4(d). The same provision states that "[f]or the purpose of determining whether funds are legally available for redemption . . ., the Corporation shall value its assets at the highest amount permissible under applicable law" (the "Valuation Provision"). *Id.*

### D. The Bubble Bursts And The IPO Is Abandoned.

On March 10, 2000, the NASDAQ peaked at 5132.52 in intraday trading, having more than doubled in the preceding year. A year later, on March 9, 2001, the NASDAQ closed at 2,052.78, down 59.3%. Three years later, on March 10, 2003, the NASDAQ closed at 1,278.37. It rapidly became clear to everyone that an IPO was no longer a realistic possibility for ThoughtWorks in the near term.

### E. ThoughtWorks Explores Ways To Redeem The Preferred Stock.

In 2003, ThoughtWorks began considering internally how it might redeem the Preferred Stock. After an extensive analysis, ThoughtWorks general counsel Daniel Goodwin and CFO Eric Loughmiller concluded that ThoughtWorks likely could not pay approximately $43 million to redeem the Preferred Stock in April 2005. In October and November 2003, Singham presented the "Solving The Put Program"

to the Global Operating Committee and the Board, identifying the redemption as one of ThoughtWorks' top three priorities.

ThoughtWorks informed SVIP in the summer of 2003 that it would not be able to meet the redemption obligation. During late 2003 and 2004, ThoughtWorks and SVIP discussed possible resolutions. In January 2005, ThoughtWorks engaged an investment bank, William Blair and Company, to seek debt financing to redeem the Preferred Stock. In the hope that financing could be obtained, SVIP agreed to postpone the earliest date the redemption payment would be due until July 5, 2005.

William Blair prepared a confidential information memorandum and distributed it to forty-five potential lenders. In April 2005, William Blair presented the lending proposals from potential lenders in a joint meeting with ThoughtWorks and SVIP. The results were disappointing. ThoughtWorks had hoped to secure at least $30 million in debt financing, but the largest proposal was for $20 million. With no ability to pay $43 million, ThoughtWorks formally offered to redeem all of the Preferred Stock for $12.8 million. SVIP rejected the offer.

Meanwhile, by demand letters sent by the various SVIP entities on May 19 and 20, 2005, SVIP exercised its redemption rights and requested immediate and full redemption effective July 5, 2005.

### F. The Working Capital Decision

On July 1, 2005, the ThoughtWorks Board held a special meeting to consider the SVIP redemption demand. The Board focused on the working capital restriction and concluded that "funds required to fund the working capital requirements of the Company [were] an amount in excess of available cash on July 5, 2005." Because of the resulting lack of usable cash, the

Board declined to redeem SVIP's shares of Preferred Stock.

After SVIP disagreed with Thought-Works' position, the Company filed a declaratory judgment action in this Court to obtain a determination that "it has the right, ongoing from year to year, to exclude necessary working capital from the funds available to pay the redemption obligation." *Working Capital Decision*, 902 A.2d at 752. This Court concluded that "the working capital set-aside applied only in fiscal year 2005, and, thus, Thought-Works must now redeem SVIP's preferred stock *to the extent funds are legally available therefor.*" *Id.* at 754 (emphasis added). The Court noted that "[t]he question whether ThoughtWorks has legally available funds under Delaware law to apply to its redemption obligation was not at issue in this action." *Id.* at 754 n. 36. A final order was entered July 25, 2006.

### G. No Legally Available Funds

Shortly after this Court issued its final order, SVIP again exercised its redemption right. On August 3, 2006, SVIP demanded that ThoughtWorks redeem its Preferred Stock for $45 million, representing the aggregate redemption price at the time.

In response, at a meeting on August 24, 2006, the Board analyzed the extent to which the Company had "funds legally available" to make a redemption payment. The Board obtained legal advice from Freeborn & Peters LLP and financial advice from AlixPartners LLC. A Freeborn memorandum set out the process for the Board to follow:

> In declaring the amount of legally available funds for redemption, the Board must (a) not declare an amount that exceeds the corporation's surplus as determined by the Board at the time of the redemption, (b) reassess its initial determination of surplus if the Board determines that a redemption based on that determination of surplus would impair the Company's ability to continue as a going concern, thereby eroding the value of any assets (such as work in process and accounts receivable) that have materially lower values in liquidation than as part of a going concern, such that the value assumptions underlying the initial computation of surplus are no longer sustainable and the long term health of the Company is jeopardized, (c) exercise its affirmative duty to avoid decisions that trigger insolvency, (d) redeem for cash, (e) apply the amount declared pro rata to the Redeemed Stock, and (f) recognize the right of the Preferred Shareholders to a continuous remedy if the amount declared is not sufficient to satisfy in full the redemption obligation under the Charter.

At the August 24 meeting, the Board determined that ThoughtWorks had $500,000 of funds legally available and redeemed Preferred Stock in that amount.

In each of the subsequent sixteen quarters, the Board has followed the same process to determine the extent to which funds are legally available for redemptions. In each case, the Board has considered current financial information about the Company and consulted with its advisors. For example, in March 2010, AlixPartners advised the Board that ThoughtWorks' "net asset value" was in the range of $6.2 to $22.3 million, and its "cash availability"—net of the previously declared but still unpaid redemptions—ranged from approximately $1 million (in the worse of two downside cases) to approximately $3 million (in the base case). After deliberating, the Board determined that the Company had no funds legally available and "declare[d] a redemption of Series A Preferred Stock in the amount of $0.00." The

Board departed from AlixPartners' more bullish view after learning that a significant customer was falling behind in its payments and that the Company's "days sales outstanding" had increased during the prior quarter.

To date, through this quarterly process, ThoughtWorks has redeemed a total of $4.1 million of Preferred Stock. That equates to 222,802 shares, of which 214,484 are held by SVIP. SVIP has declined to submit its stock certificates for payment.

## H. SVIP Pursues The Current Litigation.

On February 8, 2007, SVIP filed this action. SVIP seeks a declaratory judgment as to the meaning of the phrase "funds legally available" and a monetary judgment for the lesser of (i) the full amount of ThoughtWorks' redemption obligation and (ii) the full amount of ThoughtWorks' "funds legally available." The parties spent summer 2007 in settlement negotiations, including a day-long mediation in August 2007. They resumed discovery for the first half of 2008, then agreed to a series of standstills while settlement negotiations resumed. In February 2009, settlement talks broke down.

## I. ThoughtWorks Seeks Financing For A Redemption.

Beginning in August 2009, ThoughtWorks sought third-party financing for a potential redemption. AlixPartners prepared an information memorandum that was sent to seventy financing sources. The seventeen who expressed interest and signed confidentiality agreements received additional information. Three sources provided nonbinding commitment letters. After due diligence, two lenders provided definitive term sheets.

The first binding term sheet was from an asset-based lender that focused on ThoughtWorks' tangible collateral. Given the intangible nature of ThoughtWorks' assets, the amount of financing from this source was limited. It also was contingent on all of the Preferred Stock being redeemed in return for the loan proceeds, which would have been significantly less than full redemption price.

The second binding term sheet was from the debt financing arm of a private equity firm and focused on ThoughtWorks' ability to generate cash flow. On March 25, 2010, ThoughtWorks signed a commitment letter providing total debt financing of $30 million, including a $5 million revolving line of credit and $25 million (less expenses) to redeem the Preferred Stock. The commitment letter was conditioned on holders tendering all of the Preferred Stock. SVIP declined, and the commitment expired.

## II. LEGAL ANALYSIS

 Section 160 of the Delaware General Corporation Law (the "DGCL") authorizes a Delaware corporation to redeem its shares, subject to statutory restrictions. It provides, in pertinent part:

(a) Every corporation may purchase, redeem, receive, take or otherwise acquire . . . its own shares; provided, however, that no corporation shall:

(1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation . . . may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock . . . if such shares will be retired

upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title.

8 *Del. C.* § 160(a)(1). "A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined by 8 *Del. C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock." *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del.1997). "Net assets means the amount by which total assets exceed total liabilities." 8 *Del. C.* § 154. Under Section 160(a)(1), therefore, unless a corporation redeems shares and will retire them and reduce its capital, "a corporation may use only its surplus for the purchase of shares of its own capital stock." *In re Int'l Radiator Co.*, 92 A. 255, 256 (Del.Ch.1914).

■ Section 160's restrictions on redemptions are intended to protect creditors. *See, e.g., Propp v. Sadacca*, 175 A.2d 33, 38 (Del.Ch.1961), *aff'd in part, rev'd in part sub nom. Bennett v. Propp*, 187 A.2d 405 (Del.1962). The statute seeks to accomplish this goal by prohibiting transactions that would redistribute to stockholders assets that were part of what nineteenth and early twentieth century common law jurists deemed a permanent base of financing upon which creditors were presumed to rely when extending credit. *See, e.g., In re Tichenor–Grand Co.*, 203 F. 720, 721 (S.D.N.Y.1913) (Hand, J.) (describing a redemption from capital as taking from the creditors "[t]he fund which they have the right to rely upon"); *see generally* Bayless Manning & James J. Hanks, Jr., *Legal Capital* ch. 2 (3d ed. 1990) [hereinafter "Legal Capital"] (describing the development and theoretical underpinnings of "legal capital" as protection for creditors); *id.* at ch. 4 (describing the regulation of distributions to shareholders under the "legal capital" scheme).

As a practical matter, the test operates roughly to prohibit distributions to stockholders that would render the company balance-sheet insolvent, but instead of using insolvency as the cut-off, the line is drawn at the amount of the corporation's capital.

■ Section 160(a) permits a Delaware corporation to redeem shares of stock. For ThoughtWorks, the Redemption Provision converts that authority into a mandatory obligation by granting SVIP the power "to require [ThoughtWorks] to redeem for cash out of any funds legally available therefor . . . not less than 100% of the Preferred Stock."

ThoughtWorks does not have and cannot raise sufficient funds to redeem "100% of the Preferred Stock." SVIP contends that under the circumstances, it is entitled to a judgment against ThoughtWorks for the full amount of the redemption price. SVIP argues that:

It is common practice to include in . . . mandatory redemption provisions a phrase such as funds legally available, which simply means funds that carry no legal prohibition on their use. Under Delaware law, a corporation's surplus is legally available for the redemption of its stock. Surplus is the amount by which a corporation's net assets exceed its stated capital. . . . And here, ThoughtWorks promised in its Charter that for the purpose of calculating funds legally available for redemption it would value its assets at the highest legally permissible level. . . . At trial, SVIP's expert valued ThoughtWorks' assets to determine the amount of the company's surplus [using the three standard business valuation methodologies]. . . . The discounted cash flow ("DCF") method produced the lowest figure, but even this figure resulted in surplus in excess of the amount necessary to redeem all of

the preferred stock.... On this basis, SVIP seeks a judgment in the amount of the redemption obligation, $64,126,770.

Pl.'s Opening Br. at 1–3.

 Equating "funds legally available" with "surplus" performs all of the work in SVIP's argument. With that move, SVIP converts a provision contemplating payment "for cash" into a formula based on an incorporeal legalism. This is a fallacy:

> One result of the perspective adopted by the legal capital scheme is that lawyers and judges often speak of making a distribution "out of surplus", or of "paying out the surplus" to shareholders. There is no special harm in this manner of speaking so long as the speaker and all their listeners are fully conscious that the statement is hash. "Surplus" and "deficit" are concepts invented by lawyers and accountants. They refer to an arithmetic balancing entry on a balance sheet, to the number that is the resultant of all the other numbers on the balance sheet and that is dictated by the basic mandate of the double entry book—keeping convention—that the left side and the right side must at all times balance. Distributions are never, and can never be, paid "out of surplus"; they are paid out of assets; surplus cannot be distributed—assets are distributed. No one ever received a package of surplus for Christmas. A distribution of assets will produce accounting entries that reduce assets and also reduce something on the right hand side of the balance sheet—often surplus—but that is quite another statement.

Legal Capital, *supra*, at 37–38. Rather than examining ThoughtWorks' assets to determine whether it has "funds" that are "available" and can be used "legally" for redemptions, SVIP seeks a judgment based on an accounting convention.

## A. The Plain Meaning Of "Funds Legally Available"

 The plain meaning of "funds legally available" has more practical content. "A certificate of incorporation is viewed as a contract among shareholders, and general rules of contract interpretation apply to its terms." *Waggoner v. Laster,* 581 A.2d 1127, 1134 (Del.1990). "Contracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms." *Willie Gary LLC v. James & Jackson LLC,* 2006 WL 75309, at *5 (Del. Ch. Jan. 10, 2006), *aff'd,* 906 A.2d 76 (Del. 2006). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997). "When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract." *Liquor Exch., Inc. v. Tsaganos,* 2004 WL 2694912, at *2 (Del.Ch. Nov. 16, 2004).

Because the existence of surplus under Section 160 most commonly constrains a corporation's ability to pay dividends or redeem stock, "funds legally available" is colloquially treated as if synonymous with "surplus." The two concepts, however, are not equivalent. *Black's Law Dictionary* defines "funds" as follows:

> In the plural, this word has a variety of slightly different meanings, as follows: moneys and much more, such as notes, bills, checks, drafts, stocks and bonds, and in broader meaning may include property of every kind. Money in hand, assets, cash, money available for the payment of a debt, legacy, etc. Corporate stocks or government securities, in this sense usually spoken of as the "funds." Assets, securities, bonds, or

revenue of a state or government appropriated for the discharge of its debts. Generally, working capital; sometimes used to refer to cash or to cash and marketable securities.

*Black's Law Dictionary* 673 (6th ed. 1990) (internal citations omitted). Non-legal dictionaries define funds (plural) as "available pecuniary resources," *Webster's New Collegiate Dictionary* 461 (1979), or "[a]vailable money; ready cash," *American Heritage College Dictionary* 551 (1993). Each of these definitions focuses on cash, cash-equivalents, and other relatively liquid assets that could readily be used as a source of cash.

*Black's Law Dictionary* defines "available" as "[s]uitable; useable; accessible; obtainable; present or ready for immediate use." *Id.* at 135. Non-legal definitions of "available" include "present or ready for immediate use," *Webster's, supra,* at 77, and "[p]resent and ready for use; at hand; accessible," or "[c]apable of being gotten; obtainable," *American Heritage, supra,* at 94.

*Black's Law Dictionary* defines "legal" as "[c]onforming to the law; according to law; required or permitted by law; not forbidden or discountenanced by law; ... lawful." Id. at 892. Other definitions of "legal" include "conforming to or permitted by law or established rules," *Webster's, supra,* at 650, and "[i]n conformity with or permitted by law," *American Heritage, supra,* at 774.

The phrase "funds legally available" therefore contemplates initially that there are "funds," in the sense of a readily available source of cash. The funds must both be "available" in the general sense of accessible, obtainable, and present or ready for immediate use, and "legally" so, in the additional sense of accessible in conformity with and as permitted by law. The Redemption Provision renders this usage of "funds" all the more clear by speaking in terms of redemption "for cash out of funds legally available therefor." The Redemption Provision thus directly links "funds" to the concept of "cash."

A corporation easily could have "funds" and yet find that they were not "legally available." *See Klang,* 702 A.2d at 154 (noting that balance sheet showed negative net worth, which prevented distribution of cash via self-tender prior to revaluation of assets); *Morris v. Standard Gas & Elec. Co.,* 63 A.2d 577, 580–81 (Del.Ch.1949) (noting that balance sheet showed surplus of $25 million, which was insufficient for dividend of $88 million without revaluation of assets). A corporation also could lack "funds," yet have the legal capacity to pay dividends or make redemptions because it had a large surplus. Under those circumstances, a corporation could still redeem shares in exchange for other corporate property. *See Alcott v. Hyman,* 208 A.2d 501, 508 (Del.1965) (explaining that Section 160 authorizes "a corporation to use its property for the purchase of its own capital stock if such use will not impair its capital"). As an insightful monograph on legal capital explains,

> Occasionally, distributions are made in kind, as by parceling out security holdings or, to recall a famous World War II instance, through the distribution of warehouse receipts for whiskey. In special circumstances, a distribution may sometimes be made by distributing fractional undivided interests in a major asset, such as an oil well working agreement.

Legal Capital, *supra,* at 38 (footnotes omitted); *see* Donald Kehl, *Corporate Dividends* 170–74 (1941) (providing examples of non-cash distributions).

Even within the narrow confines of the DGCL, the terms are not co-extensive. Section 160 authorizes shares to be re-

deemed out of capital "if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244." 8 *Del. C.* § 160(a). Under those circumstances, "legally available funds" extends beyond surplus to "capital." Section 170(a) authorizes dividends, which generally can be paid only out of surplus, to be paid alternatively "out of . . . net profits for the fiscal year in which the dividend is declared and/or [sic] the preceding fiscal year." 8 *Del. C.* § 170(a). In that case, "legally available funds" extends to "net profits."

Outside the DGCL, a wide range of statutes and legal doctrines could restrict a corporation's ability to use funds, rendering them not "legally available." The Bank Holding Company Act of 1956, 12 U.S.C. § 1841, *et seq.*, requires bank holding companies to maintain certain capital requirements, and a subject company would need to take those restrictions into account. Federal employment taxes collected from employees are held in trust for the federal government,[1] as are sales and use taxes collected by corporations for eventual payment to state governments.[2] Funds subject to these and other types of restrictions would not be "legally available," whether or not the company had "surplus" under the DGCL. *See, e.g., Hurley v. Boston R. Hldg. Co.*, 315 Mass. 591, 54 N.E.2d 183, 198 (1944) (noting that corporation did not have funds legally available to redeem preferred stock because its only property was stock of a railroad which, by statute under Massachusetts law at the time, could not be sold without express legislative consent).

Most significantly for the current case, the common law has long restricted a corporation from redeeming its shares when the corporation is insolvent or would be rendered insolvent by the redemption.[3]

1. *See* 26 U.S.C. § 3402(a) (obligation to withhold income taxes); 26 U.S.C. § 7501(a) (taxes withheld or collected for payment on behalf of another are a "special fund in trust for the United States"); *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (holding that funds withheld for employees' income taxes and collected for excise taxes were held in trust for the IRS, and thus not property of the corporation even though commingled with general operating accounts).

2. *See, e.g.*, N.Y. Tax Law § 1132(a)(1) (McKinney's 2010) (requiring person collecting sales tax to do so "as trustee for and on account of the state"); 67B Am.Jur.2d *Sales and Use Taxes* § 192 (2010) ("[A] retail merchant . . . has a duty to remit use taxes and holds those taxes in trust for the state and is personally liable for the payment of those taxes to the state.").

3. *See, e.g., Vanden Bosch v. Michigan Trust Co.*, 35 F.2d 643, 644–45 (6th Cir.1929) (rejecting preferred stockholder's claim that, when redemption right matured, she became a creditor to the extent of the redemption right; rather, her right remained inferior to that of the corporation's creditors); *Clapp v. Peterson*, 104 Ill. 26, 30 (Ill.1882) (holding that validity of redemption depends on the "condition that the rights of creditors are not affected"); *Cring v. Sheller Wood Rim Mfg. Co.*, 98 Ind.App. 310, 183 N.E. 674, 678 (1932) (en banc) ("[A] preferred stockholder whose stock has matured is entitled to have the same redeemed pursuant to the terms of the instrument, unless the redemption of such stock cannot be done without prejudice to the rights of the creditors of the corporation. . . ."); *Rider v. John G. Delker & Sons Co.*, 145 Ky. 634, 140 S.W. 1011, 1012 (1911) ("It is only in cases where the corporation is solvent and the rights of creditors will not be injuriously affected thereby that agreements as to preferences among [stockholders] may be enforced."); *Hurley v. Boston R. Hldg. Co.*, 315 Mass. 591, 54 N.E.2d 183, 198 (1944) ("It is an implied limitation upon the contract for the redemption of 'preferred stock' . . . that such contract for redemption cannot be enforced if the effect is to render the corporation insolvent"); *McIntyre v. E. Bement's Sons*, 146 Mich. 74, 109 N.W. 45, 47 (1906) ("[T]he promise of . . . a corporation to buy its own stock, if under any circumstances

Black-letter law recognizes that "the shareholder's right to compel a redemption is subordinate to the rights of creditors." 11 *Fletcher's Cyclopedia of the Law of Private Corporations* § 5310 (perm. ed.).

As against creditors of the corporation, preferred shareholders have no greater rights than common shareholders. They have no preference over them, either in respect to dividends or capital, and have no lien upon the property of the corporation to their prejudice, except where the statute provides otherwise. On the contrary, their rights, both in respect to dividends and capital are subordinate to the rights of such creditors, and consequently they are not entitled to any part of the corporate assets until the corporate debts are fully paid. Nor can the corporation give them any preference, either in respect to the payment of principal or dividends, which will be superior to the rights of creditors, unless by virtue of express statutory authority.

*Id.* § 5297 (footnotes omitted). Learned commentators similarly explain that the redemption right of a preferred stockholder cannot impair the rights of creditors and therefore cannot be exercised when the corporation is insolvent or would be rendered insolvent by the payment.[4]

valid, must be considered as made, and accepted with the understanding that the shareholder may not, in face of insolvency of the company, change his relation from that of shareholder to that of creditor, escaping the responsibilities of the one and receiving the benefits of the other. To this rule there appears to be no exception."); *Mueller v. Kraeuter & Co.*, 131 N.J. Eq. 475, 25 A.2d 874, 875 (N.J.Ch.1942) ("[T]he company's agreement to redeem its stock is subject to the implied limitation that it cannot be enforced at a time when the corporation is insolvent or when redemption would render the corporation insolvent."); *Topken, Loring & Schwartz, Inc. v. Schwartz*, 249 N.Y. 206, 163 N.E. 735, 736 (1928) ("[I]t has generally been held that no corporation can purchase its stock with its capital to the injury of its creditors.... [A]ny agreement to purchase stock from a stockholder, which may result in the impairment of capital, will not be enforced, or will be considered illegal if the rights of creditors are affected."); *Richardson v. Vt. & Mass. R.R. Co.*, 44 Vt. 613, 622 (Vt.1872) (explaining that legal ability to pay a dividend (and by implication to redeem shares) "must consist of a fund adequate, not only for the payment of the claims of the plaintiffs in the cause, but for the payment of all other stockholders having like claims; and must be a surplus fund over and above what is requisite for the payment of the current expenses of the business, for discharging its duties to creditors, and over and above what reasonable prudence would require to be kept in the treasury to meet the accidents, risks, and contingencies incident to the business"); *Koeppler v. Crocker Chair Co.*, 200 Wis. 476, 228 N.W. 130, 131 (1929) ("Agreements of a corporation to repurchase its own stock are valid, and will be enforced if made in good faith and without intent to injure creditors and they do not in fact have such effect.").

4. *See, e.g.*, Henry Winthrop Ballantine, *Ballantine on Corporations* 510 (rev. ed. 1946) ("As a general rule, however, an apparently definite promise [to redeem preferred stock] is subject to an implied legal restriction that it is not enforceable against the corporation if it will endanger the collection of the corporate debts, as where the corporation is insolvent at the time when [redemption] falls due or even if it has not become insolvent until the time when the [redemption] obligation is to be enforced."); 2 Charles Fisk Beach, Jr., *Commentaries on the Law of Private Corporations* § 506 (1891) ("The stockholder must come after the creditor.... [E]quity will not interfere when by so doing an injustice would be wrought upon corporate creditors and the other stockholders, by taking money from the treasury without which the enterprise would be crippled."); 5 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 3607 (1927) ("The corporation can not, as against its creditors, secure the retirement of preferred stock by appropriating assets to that purpose which would, otherwise, be available to the creditors."); Richard M. Buxbaum, *Preferred Stock–Law and Draftsmanship*, 42 Cal. L.Rev.

Delaware follows these principles. Since at least 1914, this Court has recognized that, *in addition* to the strictures of Section 160, "[t]he undoubted weight of authority" teaches that a "corporation cannot purchase its own shares of stock when the purchase diminishes the ability of the company to pay its debts, or lessens the security of its creditors." *Int'l Radiator*, 92 A. at 255. In *Farland v. Wills*, 1975 WL 1960 (Del.Ch. Nov. 12, 1975), this Court enjoined payments by a corporation to its sole stockholder, including a repurchase of stock. The Court held that it was not necessary "to conclude preliminarily that there was an actual impairment of capital" under Section 160 of the DGCL. *Id.* at *6. Rather, the Court enjoined the repurchase on the legal principle that "[a] corporation should not be able to become a purchaser of its own stock when it results in a fraud upon the rights of or injury to the creditors." *Id.*

 A corporation may be insolvent under Delaware law either when its liabilities exceed its assets, or when it is unable to pay its debts as they come due. *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *10 (Del.Ch. Sept. 1, 2006), *aff'd*, 930 A.2d 92 (Del.2007); *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 782 (Del.Ch.2004). Although a corporation cannot be balance-sheet insolvent and meet the requirements of Section 160, a corporation can nominally have surplus from which redemptions theoretically could be made and yet be unable to pay its debts as they come due. The common law prohibition on redemptions when a corporation is or would be rendered insolvent restricts a corporation's ability to redeem shares under those circumstances, giving rise to yet another situation in which "funds legally available" differs from "surplus." *See In re Color Tile, Inc.*, 2000 WL 152129, at *5 (D.Del. Feb. 9, 2000) (holding that complaint alleging a Delaware corporation had incurred "debts beyond its ability to pay" validly pled that the corporation "lacked legally available funds at the time of the dividend declaration").

The Valuation Provision does not override these distinctions. It simply requires that when determining whether funds are legally available, ThoughtWorks must "value its assets at the highest amount permissible under applicable law." The provision recognizes that there could be situations, as in *Klang* and *Morris*, when ThoughtWorks could have "funds" on hand and yet could not satisfy applicable legal requirements, most obviously Section 160 of the DGCL. Under those circumstances, the Valuation Provision requires that ThoughtWorks re-value its assets "at the highest amount permissible under applicable law" in order to free "funds" for redemptions to the maximal extent permitted by law. The Valuation Provision does not create an obligation to redeem shares when no "funds" exist. Nor can the Valuation Provision trump other legal impediments to the use of funds for redemption, such as cash-flow

243, 264 (1954) ("[A] contract of compulsory redemption is interpreted to require redemption 'if the company is not insolvent or will not thereby become insolvent' (or harm creditors or impair capital)." (footnotes omitted)); I. Maurice Wormser, *The Power of a Corporation to Acquire Its Own Stock*, 24 Yale L.J. 177, 183, 185–86 (1915) ("The general American rule, in support of which is the decided weight of authority, affirms that a corporation has implied power to take its own shares, provided it does so in good faith and without any injury to its creditors or stockholders.... [S]uppose the contract of purchase is made when the corporation is solvent, but the payment of the purchase price for the shares would cause insolvency. This transaction also should be condemned; and the contract regarded as unenforceable since fraudulent to creditors.").

insolvency, that cannot be addressed by re-valuing assets.

SVIP's claim depends on "funds legally available" being equivalent to "surplus." Because the two concepts differ, SVIP's claim fails as a matter of law. SVIP's claim also fails because it supposes that the existence of "surplus" is sufficient to establish conclusively a corporation's obligation to redeem shares, regardless of whether the corporation actually has funds from which the redemption can be made. "Funds legally available" means something different. It contemplates "funds" (in the sense of cash) that are "available" (in the sense of on hand or readily accessible through sales or borrowing) and can be deployed "legally" for redemptions without violating Section 160 or other statutory or common law restrictions, including the requirement that the corporation be able to continue as a going concern and not be rendered insolvent by the distribution.

## B. The Amount Of Funds Legally Available

■ The Redemption Provision obligates ThoughtWorks to redeem the Preferred Stock only to the extent it has funds legally available. If ThoughtWorks lacks sufficient funds to redeem 100% of the Preferred Stock, then "funds to the extent so available shall be used for such purpose and [ThoughtWorks] shall effect such redemption pro rata according to the number of shares held by each holder of Preferred Stock." Charter art. IV(B), § 4(d). The Charter further provides that "[t]he redemption requirements provided hereby shall be continuous, so that if at any time after the Redemption Date such requirements shall not be fully discharged, without further action by any holder of Preferred Stock, funds available pursuant to Section 4(a) shall be applied therefor until

such requirements are fully discharged." *Id.*

■ Under Delaware law, when directors have engaged deliberatively in the judgment-laden exercise of determining whether funds are legally available, a dispute over that issue does not devolve into a mini-appraisal. Rather, the plaintiff must prove that in determining the amount of funds legally available, the board acted in bad faith, relied on methods and data that were unreliable, or made a determination so far off the mark as to constitute actual or constructive fraud. *Klang,* 702 A.2d at 156; *accord Morris,* 63 A.2d at 584–85.

The Valuation Provision requires that ThoughtWorks "value its assets at the highest amount permissible under applicable law." This language does not eliminate the need for judgment when determining "funds legally available." Judgment is inherently part of the valuation process, particularly when the necessary decisions encompass the corporation's ability to continue as a going concern. Nor does the Valuation Provision require this Court to mark ThoughtWorks' assets at the highest number a valuation expert can put on the Company while keeping a straight face. In *Klang,* the Delaware Supreme Court held that a corporation has the power to revalue its assets, rather than relying on book value, to show surplus for the purpose of making stock redemptions. 702 A.2d at 154. The Delaware Supreme Court did not invite practitioners of the valuation arts to calculate speculative figures. The Court rather stated: "Regardless of what a balance sheet that has not been updated may show, an actual, though unrealized, appreciation reflects *real economic value that the corporation may borrow against or that creditors may claim or*

*levy upon." Id.* (emphasis added). A projection-driven discounted cash flow analysis may not reflect "real economic value" or bear any relationship to what a corporation might borrow or its creditors recover.

SVIP failed to prove at trial that the Board ever (i) acted in bad faith in determining whether ThoughtWorks had legally available funds, (ii) relied on methods and data that were unreliable, or (iii) made determinations so far off the mark as to constitute actual or constructive fraud. Rather than litigate these issues, SVIP instructed its expert, Laura B. Stamm, to value ThoughtWorks, and she did so utilizing the discounted cash flow, comparable companies, and comparable transaction methodologies. Based on these analyses, she valued ThoughtWorks' equity in the range of $68–$137 million. SVIP's counsel instructed Stamm that in light of the Valuation Provision, her valuation was equivalent to "funds legally available." She therefore opined that ThoughtWorks had sufficient "funds legally available" to redeem SVIP's Preferred Stock.

Stamm concededly did not consider the amount of funds ThoughtWorks could use for redemptions while still continuing as a going concern. She never considered how making an eight-figure redemption payment would affect ThoughtWorks' ability to operate and achieve the projections on which her analyses relied. She had no thoughts on how ThoughtWorks might raise the funds for such a redemption payment. Although defensible as a theoretical exercise, her opinion does not credibly address the issue of "funds legally available." It does not reflect "real economic value" or bear any relationship to what ThoughtWorks might borrow or its creditors recover. It offers no assistance in determining whether the Board acted in bad faith, relied on methods and data that

were unreliable, or made determinations so far off the mark as to constitute actual or constructive fraud.

The factual record demonstrates that the Board has acted in the utmost good faith and relied on detailed analyses developed by well-qualified experts. For sixteen straight quarters, the Board has undertaken a thorough investigation of the amount of funds legally available for redemption, and it has redeemed Preferred Stock accordingly. On each occasion, the Board has consulted with financial and legal advisors, received current information about the state of the Company's business, and deliberated over the extent to which funds could be used to redeem the Preferred Stock without threatening the Company's ability to continue as a going concern. The Board's process has been impeccable, and the Board has acted responsibly to fulfill its contractual commitment to the holders of the Preferred Stock despite other compelling business uses for the Company's cash. This is not a case where the Board has had ample cash available for redemptions and simply chose to pursue a contrary course. *Cf. Mueller v. Kraeuter & Co.*, 131 N.J. Eq. 475, 25 A.2d 874, 877 (N.J.Ch.1942) (compelling corporation to take steps to redeem preferred stock where directors in prior years deployed funds exceeding amount of redemption obligation for purposes of expansion).

Most notably, the Board actively tested the market to determine what level of "funds" ThoughtWorks could obtain. A thorough canvass that included contacts with seventy potential funding sources generated a term sheet that would enable ThoughtWorks to borrow funds netting $23 million for redemptions, *if and only if* the "funds" were used to satisfy the entire obligation to the Preferred Stock. This proposal is the most credible evidence of

the maximum funds legally available for a complete redemption of the Preferred Stock. There is no evidence that Thought-Works could obtain more funds for redemption or, importantly, that any third party would finance a partial redemption.

## C. The Settled Commercial Expectations Of Investors And Issuers

 SVIP's plight is nothing new. The phrase "funds legally available" is not unique to the Charter. Those words or substantively identical variants customarily appear in charter provisions addressing dividends and redemptions.[5] Were these words omitted, a comparable limitation would be implied by law.[6] Authority spanning three different centuries adverts to and enforces limitations on the ability of preferred stockholders to force redemption.[7] Delaware's restriction on a corporation purchasing its stock when doing so

5. *See, e.g.,* 3 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* Form 5.4, § 2(A) (3d ed. 2009) (preferred shareholders "shall be entitled to receive, when, as and if declared by the Board of Directors *out of funds legally available for the purpose,* quarterly dividends payable in cash" (emphasis added)); Joseph W. Bartlett et al., *Advanced Private Equity Term Sheets and Series A Documents* § 3.07, at 3–180 (2009) ("If, on March 31, 200—, any shares of Series A Preferred Stock shall be then outstanding, the Company shall offer to redeem (*unless otherwise prevented by law*) all (but not less than all) such outstanding shares at an amount per share equal to $10 plus an amount equal to accrued but unpaid dividends, if any, to the date of redemption on such share." (emphasis added, blank in original)); National Venture Capital Association Model Term Sheet, at 6, available at http://www.nvca.org/index.php?option= com_docman&task=doc_download&gid= 75&Itemid (last visited Nov. 4, 2010) [hereinafter NVCA Model Term Sheet] ("The Series A Preferred shall be redeemable *from funds legally available* for distribution at the option of holders of at least [___]% of the Series A Preferred commencing any time after [___] at a price equal to the Original Purchase Price [plus all accrued but unpaid dividends]." (emphasis added, brackets in original)).

6. *In re Culbertson's,* 54 F.2d 753, 757 (9th Cir.1932) ("Th[e] statutory condition imposed upon the right or privilege of calling in or redeeming preferred stock, although not expressed in the retirement provisions of any of the certificates here involved, is, upon a familiar legal principle, to be read into those provisions."); *see Harbinger Cap. P'rs Master Fund I, Ltd. v. Granite Broad. Corp.,* 906 A.2d 218, 230 (Del.Ch.2006) (noting that because of legal restrictions, preferred shares "provide no guaranteed right of payment"); *HB Korenvaes Invs., L.P. v. Marriott Corp.,* 1993 WL 205040, at *5 (Del.Ch. June 9, 1993) (Allen, C.) (explaining that in light of legal limitations on a corporation's ability to make distributions to equity, preferred stock lacks rights enjoyed by creditors, like an unconditional right to periodic payments in the form of interest, and an unconditional right to capital repayment with concomitant remedies for default); *see also Vogtman v. Merchants' Mortgage & Credit Co.,* 178 A. 99, 101 (Del.Ch.1935) ("It must be assumed that when dividends are mentioned in the charter in the present connection, the word is meant to refer to dividends allowed and permitted by the law."); *cf. Moore v. Am. Fin. & Secs. Co.,* 73 A.2d 47, 48 (Del.Ch. 1950) (Seitz, V.C.) (holding that security was equity rather than debt where, among other things, payment was only required "when and if the profits of the company warrant such payments").

7. *See* Balotti & Finkelstein, *supra,* § 5.9, at 5–18 (2010) (describing limitations on redemption); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 19.01, at 19–2 to–3 (2010) (same); 1 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 160.3, at GCL–V–124 to–127 (2010) (same); Note, *Redemption of Preferred Shares,* 83 U. Pa. L.Rev. 888, 893–94 (1935) (discussing ability of preferred shares to force redemption); P.H. Vartanian, Annotation, *Validity and Effect of Agreement by a Corporation Contemporaneously with Issue or Sale of Stock, to Repurchase or Redeem the Stock or to Cancel the Subscription Therefor and Refund Consideration Paid,* 101 A.L.R. 154 (1936 & Supp.) (collecting cases); *see also* notes 3 & 4, *supra* (citing additional authorities).

would impair capital dates from 1909.[8] Faced with venerable and widely recognized impediments to mandatory redemption, investors have developed other ways to protect themselves and secure exit opportunities.

Most obviously, in lieu of preferred stock, investors can purchase convertible debt or straight debt with warrant coverage. Either combination provides the same potential equity upside as preferred stock, but carries the downside protection of a debt instrument's right to payment at a specified time, irrespective of the company's financial condition. See 1 Joseph W. Bartlett, *Equity Finance: Venture Capital, Buyouts, Restructurings and Reorganizations* § 13.5, at 300 (2d ed. 1995) (explaining that a debenture with warrants "gets the holder to the same place as a convertible preferred"). SVIP's representative, Nicholas E. Somers, was aware of the differences between debt and equity and recognized that he could have invested using debt.

Although debt offers an alternative, there are many reasons why investors and issuers might want to structure a position as equity. *See generally* George G. Triantis, *Financial Contract Design in the World of Venture Capital*, 68 U. Chi. L.Rev. 305, 311–19 (2001) (comparing venture capital preference for convertible securities, principally preferred stock, with bank paradigm of short-term secured debt). Investors who take equity stakes often insist on additional protections, such

as a springing right to board control. *See* 8 Del. C. §§ 141(d), 151(a); *Vogtman,* 178 A. 99 (Del.Ch.1935); *Petroleum Rights Corp. v. Midland Royalty Corp.,* 167 A. 835 (Del.Ch.1933). The National Venture Capital Association pointedly explains the rationale for such a provision in terms that apply to the current case:

> Due to statutory restrictions, it is unlikely that the Company will be legally permitted to redeem in the very circumstances where investors most want it (the so-called "sideways situation"), [so] investors will sometimes request that certain penalty provisions take effect where redemption has been requested but the Company's available cash flow does not permit such redemption—e.g., the redemption amount shall be paid in the form of a one-year note to each unredeemed holder of Series A Preferred, and the holders of a majority of the Series A Preferred shall be entitled to elect a majority of the Company's Board of Directors until such amounts are paid in full.

NVCA Model Term Sheet, *supra,* at 6 n. 14.

Another alternative, common in stockholders' agreements, allows a preferred stockholder to sell its security and "drag along" the remaining stockholders. "Drag along" rights, which effectively allow a preferred stockholder to sell the entire company to a third party without

8. After the 1909 revision, the DGCL stated: "Every corporation organized under this Act shall have the power to purchase, hold, sell and transfer shares of its own capital stock; Provided that no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation...." 25 Del. Laws ch. 154, § 1 (1909). Delaware has prohibited corporations from paying dividends except from surplus since the passage of the original act in 1899. 21 Del. Laws ch. 273, § 18 (1899) ("No corporation created under the provisions of this Act, nor the directors thereof, shall make dividends except from the surplus or net profits arising from its business, nor divide, withdraw, or in any way pay to the stockholders, or any of them, any part of its capital stock, or reduce its capital stock, except according to this Act....").

board involvement, are quite common.[9] A similar but stronger provision requires the forced sale of the company to the preferred stockholder. *See, e.g., Hokanson v. Petty*, 2008 WL 5169633 (Del.Ch. Dec. 10, 2008) (rejecting a fiduciary duty challenge to a merger effected pursuant to a "Buyout Option" negotiated by a preferred stockholder at the time of its investment).

The existence of these and other widely utilized alternatives demonstrates at least two things. First, sophisticated investors understand that mandatory redemption rights provide limited protection and function imperfectly, particularly when a corporation is struggling financially. If a standard mandatory redemption provision offered a clear path to a large monetary judgment and concomitant creditor remedies, then so many alternatives likely would not have evolved. My interpretation of "funds legally available" thus fulfills the settled expectations of investors and issuers as evidenced by established commercial practice.

 Second, SVIP easily could have protected its investment and avoided its current fate through any number of means. SVIP decided not to, and that choice was rational at the time. SVIP bought the Preferred Stock at the height of the dot-com mania from a technology firm with an established track record, real revenues, and actual earnings—all of which compared favorably with many issuers then embarking on over-subscribed and first-day-popping IPOs. Everyone involved anticipated that ThoughtWorks soon would go public at a multi-billion dollar valuation. Instead, the bubble burst. Now, with hindsight, SVIP understandably wishes it had additional rights, but "it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del.1998).

## III. CONCLUSION

Judgment is entered in favor of ThoughtWorks and against SVIP. ThoughtWorks will present a final order upon notice.

9. *See, e.g.,* Joseph W. Bartlett, *Equity Finance: Venture Capital, Buyouts, Restructurings and Reorganizations* § 10.15 (2010); Practicing Law Institute, *Drag–Along Rights,* 4 No. 39 PLI Pocket MBA 1 (Oct. 18, 2006); Eric A. Koester, *Venture Capital Term Sheet: Drag Along Rights* (2008) http://www.avvo.com/legal-guides/ugc/venture-capital-term-sheet-drag-along-rights (last visited Nov. 4, 2010); *see also* Cooley Godward LLP Quarterly Report, *Private Company Financings* 3 (Nov. 2004), *available at* http://www.cooley.com/files/tbl_s5SiteRepository/FileUpload21/380/PrivCo_112204.pdf (showing frequency of drag along rights).